1  WILLIAM J. LAFFERTY (No. 120814)
   GARY M. KAPLAN (No. 155530)
2  HOWARD RICE NEMEROVSKI CANADY
        FALK & RABKIN
3  A Professional Corporation
   Three Embarcadero Center, 7th Floor
4  San Francisco, California 94111-4024
   Telephone:   415/434-1600
5  Facsimile:   415/217-5910
   E-mail:      wlafferty@howardrice.com
6
   Attorneys for Chapter 11 Trustee
7  KYLE EVERETT

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11

12 In re                          Case No. 06-50441-MM

13 MICHAEL J. SCHNEIDER,          Chapter 11 Case

14             Debtor.            Date:    October 27, 2006
                                  Time:    11:00
15                                Place:   280 S. 1st St., Courtroom 3070
                                           San Jose, California
16                                Judge:   Hon. Marilyn Morgan

17

18    **OMNIBUS REPLY TO COMMITTEE OF UNSECURED CREDITORS'
      OPPOSITIONS TO PROPOSED SALE OF REAL PROPERTY**
19    **(Safari Mobile Home Park and Santa Barbara Condominium)**

20
      **[SUPPORTING DECLARATIONS OF KYLE EVERETT, ELIZABETH HENDON,
21    KARRIE BERCIK AND WILLIAM J. LAFFERTY SUBMITTED
      CONCURRENTLY]**

22

23

24

25

26

27

28

           OMNIBUS REPLY TO COMMITTEE'S OPPOSITIONS TO SALE OF REAL PROPERTY

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**TABLE OF CONTENTS**

| | Page |
|---|---|
| INTRODUCTION | 1 |

I. THE CREDITORS' COMMITTEE CANNOT ASSERT A CONSTRUCTIVE TRUST OR SIMILAR CLAIM AS TO THE SANTA BARBARA CONDOMINIUM OR THE SAFARI MOBILE HOME PARK. ........ 2

    A. The Creditors' Committee Cannot Assert Constructive Trust Or Similar Claims On Behalf Of The Schneider estate. ........ 3

        1. The Creditors' Committee Has No Authority To Bring An Action On Behalf Of The Schneider estate. ........ 3

        2. To The Extent It Purports To Represent The Schneider Estate, The Creditors' Committee Lacks Standing To Assert Constructive Trust Or Similar Claims On Behalf Of Individual Creditors. ........ 4

    B. The Creditors' Committee Cannot Assert Claims For Constructive Trust Or Similar Claims On Behalf Of Individual Fraud Creditors. ........ 5

        1. The Creditors' Committee Lacks Authority To Bring Claims On Behalf Of Individual Fraud Creditors, Who Have Neither Assigned Their Claims Nor Been Class Certified, And Doing So Presumably Would Violate The Committee's Fiduciary Duties Owed To All Creditors. ........ 5

        2. The Creditors' Committee Cannot Trace Individual Creditors' Funds As Is Required To Establish A Constructive Trust, And Imposing A Constructive Trust Here Would Run Contrary To Bankruptcy's Strong Policy Favoring Equitable, Ratable Distribution. ........ 7

II. THE CREDITORS' COMMITTEE'S VAGUE AND UNSUPPORTED ASSERTIONS REGARDING THE ALLEGED INTERESTS OF UNSPECIFIED CREDITORS IN THE SUBJECT PROPERTY ARE NOT A PROPER BASIS FOR DELAYING OR PREVENTING THE PROPOSED ASSET SALES. ........ 11

III. THE CREDITORS' COMMITTEE'S ALLEGED "TAX ISSUES" RAISE NO ISSUES RELEVANT TO THE SALES MOTIONS. ........ 13

    A. Tax Implications Of A Proposed Sale Do Not Effect The Sales Motions. ........ 13

    B. Tax Implications Of Unreported Income Do Not Impact the Sales Motions. ........ 14

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

OMNIBUS REPLY TO COMMITTEE'S OPPOSITIONS TO SALE OF REAL PROPERTY

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 2 of 28

# TABLE OF CONTENTS

**Page**

IV. THE CREDITORS' COMMITTEE HAS NOT PRESENTED ANY PERSUASIVE EVIDENCE THAT THE PROPOSED TRANSACTIONS ARE NOT IN THE BEST INTERESTS OF THE ESTATE. ............................................................................ 16

    A. The Creditors' Committee Has Provided No Evidence That The Sale Of The Condo Is Not For "Fair Value". ............................ 16

    B. The Creditors' Committee's Contentions Regarding The Value Of Safari Mobile Home Park Are Not Persuasive. ................ 17

CONCLUSION ............................................................................................................ 23

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 3 of 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)    5

*Chbat v. Tleel* (*In re Tleel*), 876 F.2d 769 (9th Cir. 1989)    11

*Golden Mortgage Fund #14 v. Kennedy (In re Golden Triangle Capital, Inc.)*, 171 B.R. 79 (B.A.P. 9th Cir. 1994)    7, 10

*In re Cont'l Airlines, Inc.*, 57 B.R. 839 (Bankr. S.D. Tex. 1985)    6, 7

*In re County of Orange*, 179 B.R. 195 (Bankr. C.D. Cal. 1995)    6

*In re First Capital Holdings Corp.*, 146 B.R. 7 (Bankr. C.D. Cal. 1992)    4

*In re Popp*, 323 B.R. 260 (B.A.P. 9th Cir. 2005)    12

*In re Rodeo Canyon Dev. Corp.*, 362 F.3d 603 (9th Cir. 2004)    12

*In re Thrifty Oil Co.*, 205 B.R. 1009 (Bankr. S.D. Cal. 1997)    7

*Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000)    8, 9

*Mixon v. Anderson (In re Ozark Rest. Equip. Co.)*, 816 F.2d 1222 (8th Cir. 1987)    5

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991)    4

*Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005)    4, 5

*Steinberg v. Buczynski*, 40 F.3d 890 (7th Cir. 1994)    4

*Taylor Assocs. v. Diamant (In re Advent Mgmt. Corp.)*, 104 F.3d 293 (9th Cir. 1997)    8, 9

*Torres v. Eastlick (In re N. Am. Coin & Currency, Ltd.)*, 767 F.2d 1573 (9th Cir. 1985), *amended by* 774 F.2d 1390 (9th Cir. 1985)    10

*Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir. 1988)    4, 5

*XL/Datacomp v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443 (6th Cir. 1994)    8

## Statutes and Rules

11 U.S.C. §363    12

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 4 of 28

# TABLE OF AUTHORITIES

**Page(s)**

Fed. R. Bankr. P.
    2004 ....... 8
    7001(1) ....... 12
    7001(2) ....... 12
    7023 ....... 6
    9014 ....... 5

Fed. R. Civ. P.
    23 ....... 6
    23(a) ....... 6
    23(b) ....... 6

## Other Authorities

Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* (15th ed. 2006)
    ¶1103.5[2] ....... 6
    ¶1103.5[6] ....... 3

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 5 of 28

# INTRODUCTION

The Opposition to Proposed Sale of Real Property (Santa Barbara Condominium) and the Opposition to Proposed Sale of Real Property (Safari Mobile Home Park) (collectively the "Opposition") filed by the Official Unsecured Creditors Committee ("Creditors' Committee") are entirely without merit.[1]

Although the primary thrust of the Opposition is that "the trustee has no equitable or legal interest in the property which he proposes to sell," whether the Creditors' Committee purports to act on behalf of the Schneider estate generally or on behalf of individual fraud creditors, it is not authorized to bring constructive trust or similar claims. Further, if it purports to act on behalf of the estate, it lacks standing to bring such claims, and if it purports to act on behalf of individual fraud creditors to the exclusion of unsecured non-fraud creditors, it violates its fiduciary duties. Nor does it even attempt to meet the strict tracing requirements of constructive trust and similar claims, nor could it. *See* Part I, *infra*. The Creditors' Committee also has not properly put any ownership dispute before the Court, instead making a number of unsupported allegations that, in the context of this proceeding, neither the Court nor the interested parties may verify. *See* Part II, *infra*.

The Creditors' Committee's concerns about the tax implications of the proposed sales are likewise based on unsupported and unfounded assertions, and in any event the tax implications of the proposed sales do not impact the sales motions. *See* Part III, *infra*.

The Creditors' Committee has likewise failed to present any persuasive evidence that the proposed sales are not in the best interests of the Schneider estate. Indeed, the initial offers for both properties are fair, and both properties are subject to an overbid process. *See*

---

[1] The Opposition is also untimely. The Creditors' Committee delayed filing its Opposition until October 24—just three days before the subject hearing, and 11 days after its Opposition became due pursuant to Rule 9014-1(c)(1) of the Bankruptcy Local Rules of the United States District Court for the Northern District of California (a due date made explicit in the Notice with which the Committee was served). As a result of this delay, the Trustee had one day to respond to the Opposition. On that basis, and in light of the many broad and amorphous claims to which the Trustee had to respond on such short notice, the Trustee respectfully requests that the Court accept this Reply, and apologizes for its length.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Part IV, *infra*. The Creditors' Committee's valuation report, which suggests otherwise, is hearsay and was not prepared by a competent appraiser, misstates and fails to take account of material facts, and is based on a flawed valuation approach. *See id.*

At the heart of this dispute is an attempt by the Creditors' Committee to subvert the long-standing policy of the Bankruptcy Code favoring equitable, ratable distribution of the bankrupt estate's assets. For all of the reasons described above, the Creditors' Committee has failed utterly to carry its burden in this regard or to otherwise offer any persuasive and founded opposition. The Court should therefore grant the Chapter 11 Trustee's Motion (1) To Establish Sale Procedures Regarding Sale of Santa Barbara Condominium, and (2) To Authorize Sale Free And Clear Of Liens And Interests ("Santa Barbara Condominium Motion") and the Chapter 11 Trustee's Motion To (1) Authorize Use Of Estate Property To Cause Sale Of Real Property Held By Debtor's Wholly-Owned Subsidiary (Safari Mobile Home Park) And (2) To Establish procedures In Connection With Such Sale ("Safari Mobile Home Park Motion").[2]

## I. THE CREDITORS' COMMITTEE CANNOT ASSERT A CONSTRUCTIVE TRUST OR SIMILAR CLAIM AS TO THE SANTA BARBARA CONDOMINIUM OR THE SAFARI MOBILE HOME PARK.

The unstated assumption on which the Creditors' Committee's Opposition depends is that it can assert constructive trust claims either on behalf of the Schneider estate generally or directly on behalf of individual fraud creditors. This assumption is incorrect; it can do neither. Even were the Court to indulge the view that the Creditors' Committee could act on behalf of the Schneider estate generally,[3] the Creditors' Committee neither has authority to do so (*see* Part I(A)(1), *infra*) nor, in that capacity, standing to assert constructive trust claims on behalf of individual creditors. *See* Part I(A)(2), *infra*. The

---

[2]The Creditors' Committee did not oppose the remaining motions noticed for the October 27 hearing, and they too should be granted.

[3]It appears that the Creditors' Committee's position is actually adverse to the Schneider estate. While the Schneider Trustee seeks to sell property within the Schneider estate for the benefit of all (*i.e.*, both fraud and non-fraud) creditors, the Creditors' Committee asserts that this property is not part of the Schneider estate at all and accordingly seeks to remove it for the benefit of fraud creditors alone, to the detriment of all other creditors.

Case: 06-50441     Doc# 366     Filed: 10/25/06     Entered: 10/25/06 23:38:11     Page 7 of 28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Creditors' Committee fares no better to the extent it purports to represent directly individual fraud creditors. It again has no authority to do so, and apparently would violate its fiduciary duty to represent *all* creditors if it were to assert claims on behalf of the fraud creditors alone, to the detriment of other creditors. *See* Part I(B)(1), *infra*. Nor in any event can the Creditors' Committee trace the funds of which individual creditors were allegedly defrauded to the Santa Barbara Condominium or the Safari Mobile Home Park. *See* Part I(B)(2), *infra*. Imposing a constructive trust in this case accordingly would unjustifiably subvert the long-standing bankruptcy policy of equitable, ratable distribution of assets for the benefit of *all* creditors, including the unsecured non-fraud creditors here, whose filed claims total more than $6 million, even excluding federal and state taxing authorities. *See id*.

**A.    The Creditors' Committee Cannot Assert Constructive Trust Or Similar Claims On Behalf Of The Schneider estate.**

**1.    The Creditors' Committee Has No Authority To Bring An Action On Behalf Of The Schneider estate.**

The Creditors' Committee has identified no statutory authority that permits it to pursue constructive trust or similar claims on behalf of the Schneider estate in the circumstances here. Nor is there any. Creditors' committees may initiate adversary proceedings in the name of debtors, but this is typically authorized only where the action would be against insiders or others that the debtor has refused or is reluctant to sue. Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶1103.5[6] (15th ed. 2006). This is not such a situation. The Creditors' Committee's purported claims are not asserted on behalf of the Schneider estate against a third party to secure an interest held by the Schneider estate. Rather, it is precisely the opposite. The Creditors' Committee seeks to proceed in a manner directly adverse to the Schneider estate with the goal of removing assets from the estate for the individual benefit of certain creditors.

Even if the Creditors' Committee had identified an estate interest and sought to act on behalf of the Schneider estate, a creditors' committee typically must meet four requirements before it may bring such an action on behalf of the estate: the claim must be colorable; the creditors' committee must make a demand on the debtor to bring the action;

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

the debtor must have refused unjustifiably to pursue the claim; and the creditors' committee must first obtain leave to sue from the bankruptcy court. *In re First Capital Holdings Corp.*, 146 B.R. 7, 11 (Bankr. C.D. Cal. 1992). The Creditors' Committee here has failed to meet *any* of these requirements: the claim here is amorphous at best (*see* Part II, *supra*) and the Creditors' Committee cannot successfully impose a constructive trust (*see* Parts I(A)(2), (B)(2), *infra*), the Creditors' Committee has not made a demand on the Schneider Trustee to bring an action on behalf of the estate and has not sought leave from the Court to do so. Nor has the Creditors' Committee demonstrated that any of these requirements should be excused.

The Creditors' Committee is simply without authority to proceed on behalf of the Schneider estate.

### 2. To The Extent It Purports To Represent The Schneider Estate, The Creditors' Committee Lacks Standing To Assert Constructive Trust Or Similar Claims On Behalf Of Individual Creditors.

Even if the Creditors' Committee somehow had authority to pursue claims on behalf of the Schneider estate, in such capacity, it could have no greater authority than the Schneider Trustee, and Ninth Circuit law uniformly establishes that a trustee lacks standing to bring claims on behalf of individual creditors. Only last year, the Ninth Circuit reiterated that "'[i]t is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself.'" *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002-03 (9th Cir. 2005) (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991); citing *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994) ("[T]he trustee is confined to enforcing entitlements of the corporation. He has no right to enforce entitlements of a creditor")).

In fact, the Ninth Circuit first recognized this rule in a case involving substantially similar facts to those here. In *Williams v. California 1st Bank*, 859 F.2d 664, 665 (9th Cir. 1988), the debtor, much as here, ran a Ponzi scheme whereby it offered for sale "investment contracts" and notes guaranteeing a monthly return of ten percent. Eventually,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

the scheme collapsed and an involuntary bankruptcy petition was filed. *Id*. Pursuant to court authorization, the trustee solicited the investors to assign their claims to the trustee, after which the trustee filed suit against California First Bank, which had acted as the debtor's depository, on behalf of the estate and those of the investors that assigned their claims. *Id*. Relying primarily on the Supreme Court's decision in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972), which, the Ninth Circuit noted remained good law under the revised Bankruptcy Code, the Court concluded: "'Congress' message is clear—*no* trustee, whether a reorganization trustee as in *Caplin* or a liquidation trustee[,] has power under . . . the Code to assert general causes of action, such as [an] alter ego claim, on behalf of the bankrupt estate's creditors.'" *Williams*, 859 F.2d 664 at 667 (quoting *Mixon v. Anderson (In re Ozark Rest. Equip. Co.)*, 816 F.2d 1222, 1228 (8th Cir. 1987)); *accord Smith*, 421 F.3d at 1002 ("As we explained in *Williams*, the holding of *Caplin* remains valid under the current version of the Bankruptcy Code, and is equally applicable to both reorganization and liquidation trustees").

In view of the foregoing, even if the Creditors' Committee had received assignment of the claims of fraud creditors (which the Creditors' Committee does not even assert, let alone demonstrate), it lacks standing to pursue such claims on behalf of the Schneider estate.

**B.    The Creditors' Committee Cannot Assert Claims For Constructive Trust Or Similar Claims On Behalf Of Individual Fraud Creditors.**

**1.    The Creditors' Committee Lacks Authority To Bring Claims On Behalf Of Individual Fraud Creditors, Who Have Neither Assigned Their Claims Nor Been Class Certified, And Doing So Presumably Would Violate The Committee's Fiduciary Duties Owed To All Creditors.**

As stated above, there is no indication that any of the individual fraud creditors have assigned their claims to the Creditors' Committee. To the extent that the Creditors' Committee seeks to assert claims on behalf of such creditors, it is apparently acting as though there is a certified class which it represents. But Section 1103 of the Bankruptcy Code, which governs the powers and duties of Chapter 11 committees, does not render a creditors' committee the representative of a class for purposes of a class action. *In re Cont'l*

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 10 of 28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

*Airlines, Inc.*, 57 B.R. 839 (Bankr. S.D. Tex. 1985). Nor is there any authority for the Creditors' Committee to maintain a class action in a "contested matter" such as this. *Cf.* Fed. R. Bankr. P. 9014 (providing list of Federal Rules of Bankruptcy Procedure applicable in contested matters, which list excludes Federal Rule of Bankruptcy Procedure 7023, the analog of Federal Rule of Civil Procedure 23, governing class actions).[4]

Even assuming, *arguendo,* that the Creditors' Committee had authority to assert claims on behalf of individual fraud creditors, doing so apparently would violate its fiduciary duties owed to all creditors. A creditors' committee owes "fiduciary dut[ies] of undivided loyalty and impartial service to *all* creditors." *In re County of Orange*, 179 B.R. 195, 202-03 (Bankr. C.D. Cal. 1995) (emphasis added); *Collier on Bankruptcy* ¶1103.5[2] ("The duty is to the class as a whole and not to individual members of the class"). But the Creditors' Committee purports to assert claims on behalf of the fraud creditors alone to the detriment of other creditors, including the Debtor's spouse, Deborah Schneider (who has filed a claim of $2.75 million for spousal and child support in connection with their marital dissolution), federal and state taxing authorities (which the Creditors' Committee asserts are multi-million dollar liabilities), and numerous other unsecured non-fraud creditors. The claims by these unsecured non-fraud creditors are not insubstantial. To date, the claims filed by unsecured non-fraud creditors *excluding* federal and state taxing authorities total more than $6 million (although the Schneider Trustee expects that the allowed amount of certain claims will be

---

[4] In any event, the Creditors Committee has made no attempt to comply with Rule 7023, as it has presented no evidence that "the class is so numerous that joinder of all members is impracticable," "there are questions of law or fact common to the class," "the claims or defenses of the representative parties are typical of the claims or defenses of the class," or "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Nor has the Creditors' Committee established that "the prosecution of separate actions by or against individual members of the class would create a risk of . . . inconsistent or varying adjudications . . . or . . . adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests," "the party opposing the class has acted or refused to act on grounds generally applicable to the class," or "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

reduced through litigation or settlement).  Asserting claims on behalf of the fraud creditors only, despite these substantial claims by non-fraud creditors, would "plac[e] the Committee squarely in the untenable position of a clear conflict of interest between one [set of] creditor[s] and another, maximizing some claims, some at the potential expense of others.  This is a conflict to clearly be avoided as a matter of law and as a matter of equity."  *In re Cont'l Airlines, Inc.*, 57 B.R. at 841 (internal citation omitted); *see also In re Thrifty Oil Co.*, 205 B.R. 1009, 1020 (Bankr. S.D. Cal. 1997) (holding that the creditors' committee "had a fiduciary duty to act in the best interests of all creditors and should have not . . . advance[d] the interest of certain creditors").

Thus, the Creditors' Committee is not only without authority to assert claims on behalf of the individual fraud creditors, it is duty bound to refrain from doing so.

### 2. The Creditors' Committee Cannot Trace Individual Creditors' Funds As Is Required To Establish A Constructive Trust, And Imposing A Constructive Trust Here Would Run Contrary To Bankruptcy's Strong Policy Favoring Equitable, Ratable Distribution.

Even if the Creditors' Committee somehow had the requisite authority to maintain a constructive trust or similar action on behalf of the individual fraud creditors, the Creditors' Committee ignores entirely the requirement that each fraud creditor trace the funds of which it was allegedly defrauded to the assets that are the subject of the Schneider Trustee's motions.[5]  The Creditors' Committee appears to assume, *without any competent evidence*, that the Santa Barbara Condominium and the Safari Mobile Home Park were necessarily acquired solely with funds derived from the fraud creditors.

In fact, while the Trustee's factual investigation is ongoing, it has thus far revealed that the Debtor inextricably commingled funds that did *not* originate from the fraud creditors with funds that did.  *See* Declaration of William J. Lafferty ("Lafferty Decl."), Ex.

---

[5]Even this assumes that the individual fraud creditors are entitled to a constructive trust remedy at all.  However, a constructive trust will *not* exclude property from the bankruptcy estate where a "debtor-creditor relationship exists."  *See Golden Mortgage Fund #14 v. Kennedy (In re Golden Triangle Capital, Inc.)*, 171 B.R. 79, 82 (B.A.P. 9th Cir. 1994).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

A (Transcript of Examination of Michael J. Schneider pursuant to Federal Rule of Bankruptcy Procedure 2004 ("Schneider 2004 Exam")) at 214:19-21 ("[M]y personal assets and the business assets were very mixed together, and there was no distinction between them"); 267:13-270:15 ("I would imagine some of the money [from the sale of real property that Schneider owned *before* acquiring California Plan] went into California Plan"). "Under the *strict tracing* standard applicable to bankruptcy cases involving commingled funds," the Creditors' Committee "bears the burden of tracing the alleged trust property *specifically* and *directly* back to the illegal transfers giving rise to the trust." *Taylor Assocs. v. Diamant (In re Advent Mgmt. Corp.)*, 104 F.3d 293, 295-96 (9th Cir. 1997) (internal quotation marks and citations omitted) (emphases added). "If [the Creditors' Committee] fails to trace the funds, [the Court] must presume that the funds constitute an interest of the debtor in property." *Id.* (internal quotation marks and citations omitted).

Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000), on which the Creditors' Committee principally and heavily relies, is in accord to the extent at all relevant.[6] The Sixth Circuit held there that the bankruptcy estate had no interest in funds that the debtor embezzled nor in property held by third parties "*traceable* to such funds" (*id.* at 931 (emphasis added)), and that the automatic stay imposed by the filing of the bankruptcy petition should be lifted "to permit the victim of the debtor's theft to pursue a state court action, initiated prepetition, to *trace* the stolen funds and obtain a judgment of constructive trust" (*id.* at 937 (emphasis added)). The court consistently characterized the relevant

_____

[6]*Newpower* involved only one individual fraud victim and one corporate fraud victim rather than, as here, more than 100 fraud creditors, making any attempt to trace funds significantly more feasible than it would be here. Further, the fraud victims in *Newpower* did not request, as the Creditors' Committee does here, that the bankruptcy court impose a constructive trust postpetition to remove assets from the bankrupt's estate that the trustee sought to sell or control. Indeed, the Sixth Circuit in *XL/Datacomp v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1445 (6th Cir. 1994), had previously held that a bankruptcy court could *not* do so. The relief sought in *Newpower*, which expressly distinguished *Omegas*, was that the bankruptcy court lift the automatic stay so that the fraud victims could pursue their prepetition claim against third parties in state court for a constructive trust. *Newpower*, 233 F.3d at 926, 934-37. In granting the relief sought, the court did not endeavor to decide who held the equitable interest in the assets that were the subject of the state court action, instead deferring to the state court to do so. *Id.*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

property as that which could be *traced* to the embezzled funds. *E.g.*, *id* at 928 ("money and property traceable to the misappropriated funds"); *id*. ("claims or causes of action to recover money and property traceable to the misappropriated funds"); *id*. at 929 ("assets traceable to the money"); *id*. at 928 ("embezzled funds or proceeds thereof"); *id*. at 931 ("property traceable to such funds"); *id*. at 931 n.4 ("property traceable to [funds]").

Despite this clear authority, the Creditors' Committee has made no showing whatsoever that it can trace the funds of which individual creditors were defrauded directly to the Debtor's acquired interest in the Santa Barbara Condominium or the Safari Mobile Home Park. The Court must therefore presume that the assets in question are properly part of the Schneider estate. *See In re Advent Mgmt. Corp.*, 104 F.3d at 295-96.

Nor is there any realistic prospect that the Creditors' Committee could trace these funds even if it sought to do so. As noted above, the Debtor apparently commingled funds that did *not* originate from the fraud creditors with funds that did, including property interests he held before his fraudulent conduct began following his acquisition of California Plan. *See* Lafferty Decl., Ex. A (Schneider 2004 Exam) at 267:13-270:15; *see also id*. at 214:19-21. In addition, his subsequent purchase of real property apparently was derived from his personal funds, as well as those of California Plan. *See id*. at 376:21-377:1 (stating that the funds used to purchase certain real property may have come from California Plan or Schneider individually); *see also id*. at 376:6-10 (explaining that California Plan may have transferred title in real estate to Schneider individually "[f]or loan purposes"). The Debtor's testimony also reflects that he treated California Plan assets and his personal assets as interchangeable, often paying expenses from one or the other depending solely on which had funds available. *See id*. at 215:15-21 ("there's a lot of transfers back and forth oftentimes . . . money was taken from whatever account could be drawn from . . . the money was transferred back and forth a lot to pay whatever had to be paid at that time"); *id*. at 254:18-255:16 (testifying that Schneider would transfer funds between California Plan and his personal investment account); *id*. at 270:15-17 ("money was going in a lot of directions according to wherever it was needed"); *id*. at 278:2-9 (explaining that Schneider

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

"imagine[s]" that certain expenses were paid from a "Cal Plan account," but that he was not certain because "money came from wherever it was available"); *id*. at 369:19-25 (stating that there were "several instances of loans going back and forth from Safari Mobile Home Park and California Plan" and that such "loans" were "[m]ostly" not formal loans, but instances of "taking money from whatever account was available to pay expenses"); *id*. at 384:20-23 ("I would use money from wherever I could get it when I needed it, and there's a good possibility that I obtained money to cover some check in some other account"). Further, funds that were to have been "placed with a loan," but which were diverted in the course of the Ponzi scheme, "completely bypass[ed] the Cal Plan's accounting system." *Id*. at 234:4-19; *see also id*. at 238:4-239:14 (agreeing that "it literally [was] the case then [that] [Schneider] [was] keeping track of all these [loans] just in [his] head" and testifying that "I could hardly keep track of what I was doing"). In short, tracing funds of which individual creditors were defrauded to the specific assets that the Schneider Trustee now seeks to sell is not feasible.

In light of the foregoing, whatever equities may be served by imposing a constructive trust in other situations cannot here outweigh "bankruptcy's equitable policy of ratable distribution" (*In re Golden Triangle Capital*, 171 B.R. at 82), which "is one of the strongest policies behind the bankruptcy laws" (*Torres v. Eastlick (In re N. Am. Coin & Currency, Ltd.)*, 767 F.2d 1573, 1575 (9th Cir. 1985), *amended by* 774 F.2d 1390 (9th Cir. 1985)). A court "necessarily [must] act very cautiously in exercising such a relatively undefined equitable power [as a constructive trust] in favor of one group of potential creditors at the expense of other creditors . . . ." *Id*. This is precisely what the Creditors' Committee asks the Court to do here. This caution is all the more warranted where funds are inextricably commingled as here. *See id*. ("[B]ecause of countervailing policies behind the Bankruptcy Act, state law could not be permitted to impose a trust on commingled property of a bankrupt's estate"). While the Schneider Trustee sympathizes with the fraud creditors, it would not be equitable to take the drastic action sought by the Creditors' Committee here to make them whole (*i.e.*, removing valuable assets from the bankruptcy estate) at the

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 15 of 28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

expense of all other creditors. Rather, bankruptcy favors a ratable distribution. *See id.*; *cf. Chbat v. Tleel* (*In re Tleel*), 876 F.2d 769, 773 (9th Cir. 1989) (holding that the trustee's "strong arm" power could avoid a constructive trust interest because "subject[ing] property to a constructive trust [and thereby] exclu[ding] [the] property from the debtor's estate . . . [would] undermin[e] the Bankruptcy Code's policy in favor of ratable distribution").

Moreover, the Schneider Trustee is much better suited than the Creditors' Committee to collect and equitably distribute the assets of the bankruptcy estates, and should not be prevented from fulfilling his statutory duties to do so, notwithstanding the Creditors' Committee's "11th hour" efforts to subvert this orderly process established under the Bankruptcy Code.

**II.  THE CREDITORS' COMMITTEE'S VAGUE AND UNSUPPORTED ASSERTIONS REGARDING THE ALLEGED INTERESTS OF UNSPECIFIED CREDITORS IN THE SUBJECT PROPERTY ARE NOT A PROPER BASIS FOR DELAYING OR PREVENTING THE PROPOSED ASSET SALES.**

Even if the Creditors' Committee had properly articulated its theory regarding the alleged interest of it or certain (unspecified) fraud creditors in the Santa Barbara Condominium and the Safari Mobile Home Park, it provides no justifiable basis for delaying or preventing the proposed sales. In addition to failing to provide *any* evidentiary support for its bald assertions, the Creditors' Committee has not properly put any ownership dispute before this Court, but has instead made a number of unsupported allegations, which neither this Court nor interested parties have any way of verifying.

While the Ninth Circuit has held up a proposed sale of estate property where there is a pending proceeding to determine disputed ownership rights in the property, that is not the case here. In *In re Rodeo Canyon Development Corporation*, the Ninth Circuit held that "a bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property" where the debtor's partner claimed a 50% ownership interest in property in which the debtor held record title, based on the partner's interest in the partnership whose funds were used to purchase the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

property. 362 F.3d 603, 609 (9th Cir. 2004).[7] Unlike in this case, the partner there had previously initiated an adversary proceeding to determine his asserted ownership interest. By contrast, the Court has no sound basis here—in fact or in law—for holding that the property is *not* property of the estate because the Creditors' Committee has made no evidentiary showing, and has not articulated a legal theory entitling it to the relief it seeks.

By contrast, the Creditors' Committee here has taken no steps, such as commencing an adversary proceeding, to determine the alleged interest of certain fraud creditors in the subject properties, or even articulated a legal theory or made an evidentiary showing entitling it to the relief it seeks. *See* Federal Rule of Bankruptcy Procedure 7001(1) & (2) (reflecting that an adversary proceeding may be used "to recover money or property" and "to determine the validity, priority, or extent of a lien or other interest in property . . . "). The Creditors' Committee's inaction is unjustified. Although the Trustee served the subject Motions in September, and the "facts" upon which the Creditors' Committee's Opposition is ostensibly based have been known for months, the Creditors' Committee waited until October 24—just three days before the subject hearing (and 11 days *after* opposition to the Motions was due) to assert an alleged ownership dispute, and has not commenced any proceeding to establish such alleged interest.

Nor has the Creditors' Committee provided any authority supporting the proposition that a proposed sale or use of property under Section 363 of the Bankruptcy Code can be attacked on the grounds offered by the Creditors' Committee in the absence of an adversary proceeding properly challenging the estate's ownership interest in the subject property. Further, as discussed above, the Creditors' Committee has neither articulated its legal theory nor provided evidentiary support for its bald contentions that the subject property is *not* property of the bankruptcy estate. Thus, there is no proper basis for the Court to hold up the proposed sales.

---

[7] The Trustee notes that the continuing viability of *In re Rodeo* and its progeny (*e.g.*, *In re Popp*, 323 B.R. 260 (B.A.P. 9th Cir. 2005)) is uncertain since the Ninth Circuit's opinion was subsequently withdrawn, as reported at 2005 U.S. App. LEXIS 3802 (9th Cir. 2005).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1      Moreover, even if the Court was willing to consider the Creditors' Committee's

2   unsubstantiated "11th hour" claims, the Court presumably could fashion appropriate relief

3   without stopping the sales, such as ordering that the sale proceeds be held in a segregated

4   account by the Trustee, pending further order of the Court.

**III.   THE CREDITORS' COMMITTEE'S ALLEGED "TAX ISSUES" RAISE NO
ISSUES RELEVANT TO THE SALES MOTIONS.**

**A.   Tax Implications Of A Proposed Sale Do Not Effect The Sales Motions.**

8      As shown above, the so-called claim of ownership raised in the Opposition is

9   legally and factually without merit.  The Creditors' Committee claims, however, that even

10  putting the "ownership issues" aside, "there remains a potentially critical tax issue."  Opp'n

11  at 7.  This claim is also without merit.

12      The Santa Barbara Condominium and Safari Mobile Home Park (together

13  referred to as the "Property") sales will generate a gain to the extent that the sale price

14  exceeds the Property's basis.  The gain will be an administrative expense of the Schneider

15  estate.  The Creditors' Committee concedes that any party will pay a tax on the capital gains

16  to the extent that the purchase price exceeds basis.  The Schneider estate's basis in the

17  Property is the amount paid for the Property plus amounts paid for improvements less any

18  accumulated depreciation.  The Creditors' Committee states that the fraud creditors might be

19  able to assert a different basis in the Property than the Schneider estate.  There is no reason

20  to believe that the fraud creditors could assert a different basis than the Schneider estate.

21  The Creditors' Committee has offered no explanation of how the fraud creditors could

22  receive a higher basis than the Schneider estate.

23      If the Property is transferred to the fraud creditors as proposed by the Creditors'

24  Committee, the fraud creditors would either take the Property with the same basis as the

25  Schneider estate or it may be able to obtain the Property at a fair market value basis.

26  However, any transaction that would give the fraud creditors a fair market value basis would

27  cause the Schneider estate to recognize a gain on the Property transfer.  The Schneider

28  Trustee's tax counsel discussed the Property sale tax consequences with the Creditors'

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Committee at the October 18, 2006 meeting. *See* Declaration of Kerrie Bercik ("Bercik Decl.") at ¶ 2. Any transfer that would give the fraud creditors a higher basis than the Schneider estate would be treated as a sale to the fraud creditors at the fair market value of the property without any cash being paid to the Schneider estate. This deemed sale of the Property would cause the Schneider estate to recognize a gain on the transfer of the Property to the fraud creditors. This gain, just like the proposed sale for cash, would be an administrative expense of the Schneider estate. However, unlike the sale for cash – there would be no cash to pay the administrative tax claim. Thus, the Schneider estate would recognize the same gain on the cash sale as it would recognize upon a transfer of the Property out of the estate to the fraud creditors.

If the Property were transferred to the fraud creditors in a manner that allows the fraud creditors to take the same basis in the Property as the Schneider estate currently has in the Property, then the fraud creditors would pay the same tax on the property sale that the Schneider estate would pay. In such case, the amount of tax paid will be the same regardless of whether the Schneider estate or the fraud creditors sell the Property. The Trustee understands that the Creditors' Committee does not even contest this proposition.

**B.      Tax Implications Of Unreported Income Do Not Impact the Sales Motions.**

The Creditors' Committee states that both the Schneider and Cal Plan estates have potentially gigantic income tax issues. It further states that the Trustee's tax counsel, Ms. Bercik, has guesstimated a "many-million" dollar income tax liability. Ms. Bercik never guesstimated any specific dollar tax liability. *See* Bercik Decl. at ¶ 3. She responded to a hypothetical in which the Creditors' Committee speculated a many million dollar tax from Schneider's unreported income. *Id.* Ms. Bercik explained the proposed method of resolving the tax liability with the IRS. *Id.* Even the proposed method offered by Ms. Bercik would not result in a many-million dollar income tax liability.

The Trustee and his tax counsel are in the process of resolving the tax issues with the IRS. Ms. Bercik has answered the IRS' request for information and has proposed a time for the IRS to review/audit the Schneider estate's records requested. *Id.* ¶4. Currently, the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 19 of 28

IRS is focusing on the last three years of Schneider's income tax returns. The Trustee has proposed November 1, 2006 for the IRS audit. *Id.* ¶5. The IRS is assembling their team to review the documents and deciding whether the team is available on that date. Additionally, the Trustee is in the process of setting up a meeting with James Whitten, IRS Office of Chief Counsel to discuss the parameters of the potential tax claim. *Id.* ¶6.

The Trustee and his tax counsel are diligently working to resolve the IRS tax claim in an expedient fashion. The Trustee intends to amend Schneider's tax returns to include the agreed upon unreported income. However, the Schneider estate will be entitled to a credit to the extent that it repays the fraud creditors. Depending upon the amount of the claim and the amount of payment to the fraud creditors, the net effect of the deduction could result in little or no liability to the estate for prior taxes.

The current sale of the Property in no way impacts the amount that the Schneider estate will pay with respect to Schneider's unreported income. The fact that the Trustee has not resolved the past tax liability from the unreported income is irrelevant to the sale. The Creditors' Committee desires to characterize this as a "tax issue" and say that the "wrong move" will leave the fraud creditors with nothing in this case. In reality, the sale does not create a tax issue for the fraud creditors as set forth above. Additionally, the amount of the IRS claim for unreported income is in no way related to or dependent upon the Property sale. Although the Creditors' Committee is characterizing this as a tax issue, its real argument has nothing to do with the amount or nature of the tax claims as a result of the Property sale. In fact, the Creditors' Committee's only argument is that the Property is not property of the estate and therefore the proceeds from its sale can't be used to pay a tax claim of the estate.

The Creditors' Committee argument is not a tax issue; it is a question of whether the Property is property of the estate. If in fact this Court decides that the Property is not property of the estate as asserted by the Creditors' Committee, the Trustee agrees with the Creditors' Committee that the sale proceeds would also not be property of the estate. In such case, the proceeds could not be used to pay Schneider's priority tax claims. Since neither the Property nor the proceeds of the sale of the Property may be used to pay

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 20 of 28

Schneider's tax claims if it is not property of the Schneider estate, the sale of the Property does not create any risk that the proceeds of the sale would be used to pay tax claims and leave the fraud creditors with nothing as suggested by the Creditors' Committee.

## IV. THE CREDITORS' COMMITTEE HAS NOT PRESENTED ANY PERSUASIVE EVIDENCE THAT THE PROPOSED TRANSACTIONS ARE NOT IN THE BEST INTERESTS OF THE ESTATE.

The Creditors' Committee also argues that the Court should not approve the Santa Barbara Condominium Motion and the Safari Mobile Home Park Motion based on the Creditors' Committee's assertion that the proposed transactions are for less than fair value and will thus not be in the best interests of creditors. The Creditors' Committee's arguments on this subject are based on either no evidence whatsoever (with regard to the Santa Barbara Condominium Motion), or unpersuasive evidence (with regard to the Safari Mobile Home Park Motion), and should be disregarded.

As a general matter, and as set forth in greater detail in the Santa Barbara Condominium Motion and the Safari Mobile Home Park Motion, the Court should grant the Trustee significant deference in these matters, and should, in the absence of clear evidence that the proposed transactions are not in the best interests of the estate, grant the Motions.

### A. The Creditors' Committee Has Provided No Evidence That The Sale Of The Condo Is Not For "Fair Value".

With regard to the Santa Barbara Condominium Motion, although the Creditors' Committee asserts that it "believes" that the value of the Condominium is $1,550,000, the Creditors' Committee supplies no evidence whatsoever for this value, or any other value. On this basis alone the Court should disregard the Creditors' Committee's arguments regarding value for the Condominium.

It is unremarkable in any event for the Creditors' Committee to "opine" that the fair value of the Condominium is equal to the listing price. Having listed the Condominium for sale at a concededly fair price, the Trustee's real estate broker worked diligently to prepare the Condominium for sale and to market the property to proposed buyers. These efforts were set forth in great detail in the Declaration of Elizabeth Hendon, filed

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

concurrently with the Santa Barbara Condominium Motion. The fact that the Trustee accepted an offer for approximately seven percent (7%) less than the listing price is also unremarkable; the marketing and sale process were intelligently conceived and diligently pursued, and the sale is subject to overbids. Any party wishing to bid more for the Condominium may appear at the hearing and do so. And as the Supplemental Declaration of Elizabeth Hendon sets forth, she continued to market the Condominium after the Trustee's acceptance of the offer, and used her best efforts to foster interest in the Condominium by other potential purchasers, in order to maximize the value to be received by the estate. *See* Reply Declaration of Beth Hendon ("Supp. Hendon Decl.") at ¶¶5-6.

The Hendon Reply Declaration also contains information regarding comparable sales of condominiums in the area, and demonstrates that the proposed sale is a very favorable transaction under all of the circumstances. *See id*. ¶¶10-14.

The Creditors' Committee's other "complaints" are also without merit. The Creditors' Committee asserts that the Condominium was shown to prospective buyers during the refurbishment process, thereby creating a less favorable impression of the Condominium, an assertion which the Hendon Declaration clearly refutes. *See* Hendon Decl. ¶¶6-8. Likewise, the Creditors' Committee's assertion that the Condominium should have been "staged" for sale is rebutted by Ms. Hendon's opinion that "staging" is simply not helpful to a marketing process until a property has failed to garner any offers for a significant period of time. *See* Hendon Reply Decl. at ¶15. And the Creditors' Committee's comments concerning the "luxury" status of the Condominium and the "gated community" are simply not relevant to value here; what is relevant to value is the amounts generated by sales of comparable units, and the evidence that the Trustee and his professional have appropriately marketed the Condominium. The Court should reject any argument that the sale of the Condominium is not at fair value, and should not be approved.

**B.  The Creditors' Committee's Contentions Regarding The Value Of Safari Mobile Home Park Are Not Persuasive.**

The Creditors' Committee's critique of the sale of the Safari Mobile Home Park

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

(the "Safari Park") is no more persuasive. As an initial matter, the Court should recall that, because Safari Mobile Home Park, LLC (the "LLC") is a separate legal entity which is not itself in bankruptcy, the relief requested in the Safari Mobile Home Park Motion is not the approval of the sale of Safari Park. Rather, the relief requested is authorization for the Trustee to utilize the estate's interest as the sole member of the LLC to consummate the LLC's sale of Safari Park to a third party. For this reason, the Trustee believes that the Court should apply even greater deference to the Trustee's business judgment in this instance than in the case in which property of the estate is being sold.

In either event, the Creditors' Committee's assertions that Safari Park has a significantly higher value than the initial offer do not stand up to scrutiny.

In the first place, the Trustee's efforts to sell the Safari Park have been appropriate, and will achieve a fair value for the property. As stated in greater detail in the Safari Mobile Home Park Motion and the Everett Declaration in support thereof, the Trustee has been actively involved in seeking expeditiously to market and sell the Safari Park, including advertising the proposed sale in national periodicals and on a nationally recognized website focusing on mobile home parks (mobilehomeparkstore.com). In response to these efforts, the Trustee has received over thirty requests for information concerning the Safari Park and the sale, and the Trustee has sent "Bid Packages" to each person so inquiring. Based on this response, and on the Trustee's subsequent discussions with potential overbidders, the Trustee expects that numerous potential purchasers may attend the October 27 hearing on the Motion and that there could be multiple overbids for the Safari Park.

The Creditors' Committee's Opposition to the Safari Mobile Home Park Motion is based on the Declaration of Saeed Fazelli in Opposition to Proposed Sale of Real Property (Safari Mobile Home Park) (the "Fazelli Declaration") and the "Marketing Opinion of Value" prepared by Del Dietrich of American Commercial Realty, Inc. (the "Valuation Report") a copy of which is attached to the Fazelli Declaration. The Valuation Report posits a value of $1,290,000 for the Safari Park, based exclusively on Mr. Dietrich's opinion (a)

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

that the value of the Safari Park may be derived by multiplying the number of "spaces" available at a mobile home park by a deemed value for each space, and (b) that the appropriate deemed value for the spaces at the Safari Park is $30,000 per space.

As an initial matter, the Valuation Report is clearly hearsay, because it is the statement of a party other than the declarant which is being offered for the truth of the matter asserted. Rule 801, Federal Rules of Evidence. As such, the Court should not admit into evidence or consider the Valuation Report. Rule 802, Federal Rules of Evidence. This outcome is not altered by the fact that Mr. Fazelli purports to "adopt" or "approve" the conclusions of the Valuation Report, since there is no evidence that Mr. Fazelli is competent to opine about such matters.

Moreover, neither the Valuation Report nor the Fazelli Declaration establish Mr. Dietrich's expertise or competence in valuing the Safari Park. Rather, Mr. Dietrich's Curriculum Vitae (included in pages 13-14 of the Valuation Report) indicate that he is licensed real estate broker affiliated with certain realtor and broker association, but reflect no license, education or experience in appraising commercial property (let alone mobile home parks such as the Safari Park), or even any professional affiliations with organizations of appraisers. Thus, Mr. Dietrich does not appear qualified to provide any expert opinions regarding the value of the Safari Park. Nor does the Valuation Report state that it is an appraisal performed in accordance with any professional standards such as the Appraisal Institute Code of Ethics and Standards of Professional Practice.

The Valuation Report also contains material misstatements of fact. For example, the Valuation Report states that there are forty-three (43) spaces currently available for rent at the Safari Park; in fact, there are only thirty-nine (39) spaces available.[8] *See* Declaration of Kyle Everett ("Everett Decl.") at ¶8. The Valuation Report states that the gross monthly

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[8]Although the advertisement for the Safari Park erroneously stated that the Safari Park had 43 spaces, the "Bid Package", which described the Safari Park in greater detail, correctly stated that there were 39 spaces. Mr. Dietrich asked for, and received a copy of the Bid Package.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1     revenue generated by the Safari Park is between $14,000 and $15,000; in fact, the gross

2     monthly revenue at the Safari Park during the Trustee's tenure has averaged approximately

3     $10,200, including utility payments by the tenants (which are "pass-through" charges).[9] *Id.*

4          The Valuation Report also fails to take account of other material facts concerning

5     the Safari Park's operation and the LLC's financial condition. The Valuation Report

6     concedes that the preparer did not have access to information concerning the monthly

7     expenses at the Safari Park and thus could not prepare an analysis of the net operating

8     income ("NOI") generated by the Safari Park, or a valuation of the property based upon the

9     application of a "capitalization rate" to the NOI. In fact, the monthly operating expenses at

10     the Safari Park (not including debt service) average approximately $8,115 per month

11     (including an accrual of $1,000 per month for property taxes), leaving an average monthly

12     NOI, prior to debt service, of approximately $2,085. *Id.* ¶9. This information was also

13     included in the Big Package, a copy of which the Trustee provided to Mr. Dietrich.

14          The Valuation Report derives a value for the Safari Park based upon comparison

15     with the sales of several allegedly "comparable" properties. However, there are numerous

16     problems with this approach. First, none of the alleged "comparable sales" have occurred

17     within the past year; in fact, the bulk of these sales have taken place between eighteen and

18     thirty-three months ago. The Valuation Report does not suggest why such stale

19     "comparables" are useful in deriving a value for the Safari Park, nor even comment on sales

20     or value trends in the mobile home industry. The Court and interested parties may infer

21     from the fact that no recent "comps" were supplied that the current market for mobile home

22     parks is less than robust.

23          The Valuation Report also assigns a deemed value of $30,000 to each space at the

24     Safari Park, without any explanation as to how this number was arrived at, even though the

25     per space values for the "comps" range from $23,809 to over $54,000. Nor does the

26

27          [9]The gross revenue during the two years prior to the commencement of this case, during which the property was managed by the Debtor, also never exceeded $11,100 per

28     month. This data was also provided to Mr. Dietrich.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   Valuation Report state the vacancy rates for the "comps", nor suggest how such a vacancy

2   rate would factor into the price per space calculation.  The vacancy rate at the Safari Park is

3   approximately thirty-one percent (31%) (there are thirty-nine (39) spaces available, of which

4   only twenty-seven (27) have been rented during the Trustee's tenure).  *Id.* ¶11.  It is difficult

5   to believe that such a significant vacancy rate would not have a material effect on the

6   valuation of the Safari Park, including on a "per space" basis.[10]

7        The Valuation Report also does not comment on, or appear to make any

8   adjustments for, the location of the Safari Park, the age of the property, the condition of the

9   property, or the demographics of the area.  For this reason as well, the Valuation Report does

10  not provide a realistic opinion of value.

11       The Valuation Report also does not attempt to value the Safari Park by applying a

12  capitalization rate to the Property's NOI.  To the extent that the Valuation Report relies on

13  only one method of valuation, and contains no analysis of appropriate adjustments to that

14  value, the Valuation Report is flawed, and does not provide a realistic valuation of the Safari

15  Park.  Of course, even if one applied a seven percent (7%) "cap rate" (apparently the most

16  favorable rate included in the schedule of allegedly comparable sales) to the NOI of the

17  Safari Park, one would derive a value of less than $358,000 for the Safari Park (*i.e.*, $(2,085

18  x 12)/0.07 = $357,428).

19       Lastly, the Valuation Report also purports to opine that the value of the Safari

20  Park could be increased by various "improvements".  This conclusion is also flawed, for a

21  number of reasons.  First, there is nothing in Mr. Dietrich's curriculum vitae or in the

22  Valuation Report that suggests that he has any education, experience or qualifications that

23  would make him competent to offer an opinion concerning the economic effect of

24  improvements on the Safari Park, let alone the feasibility of any such improvements as a

25

26       [10]Of course, even if one used the deemed value per space in the Valuation  Report,
    based on current occupancy at the Safari Park, one would derive a value for the property of
27  $810,000 ($30,000 x 27 = $810,000), which is not far from the current offer price of
    $750,000 (prior to overbids).
28

general matter or the feasibility of making improvements at this property. And the Valuation Report contains no analysis of or evidence regarding the effect of such improvements, other than a colloquial reference to a "comp" sale which occurred over two and a half years ago.

In fact, the Safari Park generates little revenue and the NOI is not sufficient even to cover the debt service. The property is encumbered by a promissory note (the "Note") to "Ruth G. Mauldin, Surviving Trustee of the Grover A. Mauldin and Ruth G. Mauldin 2001 Revocable Living Trust" in the principal amount of $279,443.97, which is secured by a first position deed of trust (the "Deed of Trust") against the Safari Park. *Id.* ¶15. The monthly payments on this obligation are approximately $2000, which is essentially equal to the Safari Park's monthly NOI on an average basis. *Id.* The LLC is currently in default under the Note and the Deed of Trust, and the lender has commenced foreclosure proceedings against the Safari Park by filing a Notice of Default on September 18, 2006 (a true and correct copy attached to the Everett Declaration as Exhibit A).

Under these circumstances, the LLC simply has no resources available to make improvements to the Safari Park, even were it correct to assume that such improvements would materially improve the value. And the commencement of foreclosure proceedings against the Safari Park makes it all the more obvious that it is simply unrealistic to expect that the LLC has the time or the opportunity to "wait" on a sale of the property while such improvements are made.

The Creditors' Committee's objection arguments that the proposed sale of Safari Park by the LLC is for less than fair value is without merit, and should be overruled by the Court.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 06-50441    Doc# 366    Filed: 10/25/06    Entered: 10/25/06 23:38:11    Page 27 of
28

## CONCLUSION

For the foregoing reasons, the Court should grant the Santa Barbara Condominium Motion and the Safari Mobile Home Park Motion.

DATED:  October 25, 2006.

Respectfully,

HOWARD RICE NEMEROVSKI CANADY
     FALK & RABKIN
A Professional Corporation

By: _____/s/_____
          WILLIAM J. LAFFERTY

Attorneys for Chapter 11 Trustee KYLE EVERETT

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation