**Entered on Docket
October 22, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



**NOT INTENDED FOR PUBLICATION**

**The following constitutes
the order of the court. Signed October 22, 2007**

*Marilyn Morgan*

**Marilyn Morgan
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:

**MICHAEL J. SCHNEIDER,**

　　　　Debtor.

Case No. 06-50441-MM

Chapter 11

**MEMORANDUM DECISION AND ORDER ON FIRST INTERIM APPLICATION OF HOWARD RICE FOR COMPENSATION AND EXPENSE REIMBURSEMENT**

### INTRODUCTION

Before the court is the first interim application by Howard Rice Nemerovski Canady Falk & Rabkin, as counsel to the trustee, Kyle Everett, for compensation in the amount of $1,053,802 and expense reimbursement of $38,336.06 for services rendered during the six month period from March 24, 2006 through September 30, 2006.

### FACTUAL BACKGROUND

Michael Schneider was the principal and sole shareholder of California Plan, Inc., a mortgage brokerage company that serviced loans and solicited private investors to make loans at above-market rates secured by deeds of trust on real property. Schneider, who was then an account executive for California Plan, purchased the business from its founder in 1993. California Plan had been in business

1

Case: 06-50441    Doc# 757    Filed: 10/22/07    Entered: 10/22/07 16:36:18    Page 1 of 21

since the 1960's with its core business of arranging secured loans from investors. It historically earned revenues by charging interest on loans at rates above the return promised to investors. More recently, it generated revenues through loan origination fees, points, foreclosure fees, late fees and prepayment fees. However, its revenues were insufficient to fund operating expenses and interest payments to investors. By the late 1990's, California Plan did not always repay the investors when borrowers paid off the loans. It would reconvey the deeds of trusts but not inform the investors. Rather, it continued to make monthly interest payments to investors but retained or diverted the proceeds of the payoffs. The misappropriation was not susceptible to easy discovery because California Plan serviced the loans through a company account, so the lenders were unaware when the borrowers ceased making payments.

California Plan would also accept funds from multiple investors but advance none or only some of the funds to a borrower. The balance of the funds were used to service existing loans. However, Schneider represented to those investors that their loans were secured by specific real estate. Investors received copies of deeds of trust, some of which had been forged and falsified with a recording stamp. As a result, not all investors were secured notwithstanding Schneider's representations. Schneider contends that California Plan already had a book of bad loans at the time he acquired the business in 1993.

The Aspromonte investor group conducted an investigation that revealed California Plan's fraud scheme. Based on their investigation, they commenced chapter 7 cases by filing involuntary petitions under 11 U.S.C. § 303 against both Schneider and California Plan on March 24, 2006. Schneider and California Plan consented to orders for relief under chapter 11. Orders for relief were issued on April 12, 2006. On motion by the petitioning creditors, the court ordered the appointment of chapter 11 trustees in both cases.

The United States Trustee selected Kyle Everett of Development Specialists, Inc. to serve as trustee in this case because he possesses forensic accounting skills useful in tracing misappropriated funds and has access to diverse management, financial, and accounting skills within his firm. Everett requested that the court appoint Howard Rice Nemerovski Canady Falk & Rabkin as legal counsel to represent him in the case. He selected the firm on the basis of its depth of experience in a wide variety of practice areas, including bankruptcy, real estate and land use, and tax strategies and planning. The

firm also has an excellent reputation for its responsiveness and performance in complex cases. The court appointed the firm as counsel for the trustee by order issued on April 26, 2006.

Schneider was indicted and has been incarcerated since shortly after the petitions were filed and the fraud scheme was revealed. He has since pled no contest to 173 felony counts and is awaiting sentencing.

Shortly before the petition was filed, Schneider's non-debtor spouse, Deborah Schneider, filed a petition for legal separation from the debtor. The debtor and his spouse have four children, the youngest of whom was born after the involuntary petition was filed. The trustee through his counsel conducted Rule 2004 examinations of the debtor's spouse and litigated with her concerning an unauthorized post-petition transfer, her claims of exemption, and her claims for spousal and child support.

At the inception of the case, the debtor's assets consisted primarily of interests, held either directly or through limited liability companies, in twenty-five real properties in California and Indiana. The trustee has been liquidating the real properties. During the course of its representation of the trustee, the applicant also took possession of the debtor's books and records, conducted investigations of the debtor's assets and liabilities, and met with and negotiated with the trustee of the California Plan estate.

There is a substantial overlap in claims between this estate and the California Plan estate. Claims filed in the Schneider case total approximately $85 million, including a $25 million constructive trust claim that California Plan asserted against Schneider. Claims filed in the California Plan case total approximately $55 million. Many of California Plan's investors are elderly people with fixed incomes. Some individual creditors have asserted losses of as much as $6 million. The estate of California Plan has relatively limited assets, while the Schneider estate has some significant assets consisting primarily of the real properties. It appears that Schneider misappropriated assets of California Plan to acquire assets in his own name. The court has approved a compromise between the two estates to allocate fifty-five percent (55%) of the net proceeds of the Schneider estate to California Plan on account of its constructive trust claim. The Schneider trustee would focus on the location, preservation, and liquidation of assets, while the California Plan trustee would focus on the determination of the nature,

---

extent, and validity of claims. It is not anticipated that the defrauded investors and other creditors will receive substantial distributions on their claims.

Howard Rice requests approval of compensation in the amount of $1,053,802 in fees and $38,336.06 in expense reimbursement incurred during the period March 24, 2006 through September 30, 2006. These amounts reflect voluntary reductions of $68,364 in fees and $1,353.84 in expenses. The court referred the application for review by a fee auditor, Stuart, Maue, Mitchell & James, which reviewed the fee application, analyzed its conformity to the Guidelines for Compensation and Expense Reimbursement for Professionals and Trustees for the United States Bankruptcy Court, Northern District of California (the "Fee Guidelines"), and reorganized the time entries for certain project categories as directed by the court. The fee auditor then generated a report of its analysis and findings (the "Audit Report"), which it filed with the court.

Howard Rice has filed a Response to the Audit Report in support of the fees requested. It restated some of its time entries in response to the Audit Report, supplemented its narrative to add context and explanation by specific project categories, explained why it believes its requested fees are reasonable, and highlighted instances where it believes the methodology of the Audit Report is flawed. In the interest of concluding this matter expeditiously, it made additional voluntary reductions of $22,430.48 in fees and $490.35 in expenses. It requests that the court approve its fee application as submitted, less the firm's voluntary reductions.

The Unites States Trustee filed a response supplementing the time entries identified in the Audit Report but requested that the court make some blanket reductions rather than itemize the entries disallowed. It expressed particular concern with excessive interoffice conferencing, the assignment of multiple attorneys to tasks, and billing for clerical and administrative tasks. It concluded by questioning the reasonableness of the fees billed in view of the limited resources and significant creditors' claims in this case.

Creditors Saeed Fazeli, Mel Nashban, and Anthony Poch (the "Creditors") respond to the Audit Report, objecting to the applicant's fees as excessive. The Creditors are former investors of California Plan. They are intelligent, articulate individuals representative of a much larger group of investors who have lost substantial savings as a result of Schneider's fraud scheme. The particular concerns that the

Creditors identified in their response include that the case should be converted to reduce professional fees, that the applicant is performing the trustee's duties, and that the applicant has overcharged the estate for its asset investigation. Feelings are strong because for each dollar paid to counsel, there is less to distribute to creditors. The court is aware of a veiled threat from a member of this group referencing the events at 101 California Street in San Francisco, where a former client shot and killed numerous members of a law firm.

## LEGAL DISCUSSION

Section 330(a) of the Bankruptcy Code provides that the court may award to a trustee, an ombudsman, an examiner, or a professional person employed under §§ 327 or 1103 reasonable compensation for actual, necessary services rendered and reimbursement of actual, necessary expenses. The applicant bears the burden of establishing entitlement to an award and demonstrating that the fees are reasonable. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).

When the Bankruptcy Code was enacted, Congress stated that the estate's professionals should be reasonably compensated for their services. The House Report provides:

> The compensation is to be reasonable, for actual and necessary services rendered, based on the time, the nature, the extent, and the value of the services rendered, and on the cost of comparable services other than in a case under the Bankruptcy Code. The effect of the last provision is to overrule In re Beverly Crest Convalescent Hospital, Inc., 548 F.2d 817 (9th Cir. 1976, as amended 1977), which set an arbitrary limit on fees payable, based on the amount of a District Judge's salary, and other, similar cases that require fees to be determined based on notions of conservation of the estate and economy of administration. If that case were allowed to stand, attorneys that could earn much higher incomes in other fields would leave the bankruptcy arena. Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service.

H.R. REP. 95-595, at 6286 (1977).

The Bankruptcy Code also expressly contemplates that the expenses of administration would have priority in payment ahead of unsecured creditors in a bankruptcy case. Section 503(b)(2) provides that "there shall be allowed administrative expenses . . . including . . . (2) compensation and reimbursement awarded under section 330(a) of this title. . . ." Section 507(a)(2) provides that

5

administrative expenses allowed under section 503(b) are entitled to priority, and § 726(a) provides that priority claims will receive a distribution from the estate before unsecured claims are paid. The obvious reason for this priority scheme is that no professional would otherwise be willing to provide services to administer a bankruptcy estate.

**A.    Compensation for Services That Were Previously Inadequately Described is Allowed.**

The Audit Report identified in Exhibits B-1 and B-2 time entries totaling $72,806.41 for which the task descriptions were inadequate. The United States Trustee in its response to the Audit Report identified additional time entries totaling $2,651.25 for which the descriptions were inadequate. Time entries must identify the other party to the conference, meeting, telephone call, or correspondence and include a description of the task performed and the subject matter involved. The applicant bears the burden of describing the services performed in sufficient detail to enable the court to make a meaningful assessment whether those services were actual, necessary, and beneficial to the estate and whether they were performed within a reasonable amount of time.

In response to the comments of the fee auditor and the United States Trustee, Howard Rice has cured the deficiencies by restating the time entries in Exhibits B-1, B-2, and B-3 of its Response to the Audit Report. By supplementing the time entries, Howard Rice has adequately addressed the court's concerns about the sufficiency of the task descriptions and has enabled the court to determine whether the services are compensable. In correcting the entries, however, Howard Rice voluntarily reduced the time attributable to numerous entries by a total of $3,293.85. It also removed $2,681.25 in entries billed by an attorney who is no longer with the firm. Consequently, the fees associated with the time entries in Exhibits B-1 and B-2 to the Audit Report and the $2,651.25 identified in Exhibit A to the United States Trustee's Response to the Audit Report are allowed, but the fees are reduced by $5,975.10 attributable to the applicant's voluntary adjustment.

**B.    Compensation for Time Entries That Clump Unrelated Services is Disallowed.**

The Audit Report identified in Exhibit C $126,141.50 in time entries that clump unrelated services. The United States Trustee identified an additional $1,837.50 in such entries. The clumping

of disparate services in a single time entry renders the court's review of the entries difficult. See In re Dutta, 175 B.R. 41, 46-47 (B.A.P. 9th Cir. 1994). Paragraph 14 of the Guidelines provides that if a number of separate tasks are performed in a single day, the application should disclose the time spent for each separate task.

In response to the comments of the fee auditor and the United States Trustee, the applicant has restated the clumped time entries in Exhibits 4 and 5 of its Response to the Audit Report. The time entries as restated discloses the time spent for each separate task, enabling the court to determine whether the time spent was reasonable. However, the applicant declined to "unclump" one entry on July 18, 2006 by timekeeper D. Schenkkan in the amount of $937.50. It also voluntarily reduced its fees in this category by $1,565 attributable to 2.6 hours and removed $2,365 in fees billed by two attorneys who are no longer with the firm. As a result, the total amount of the reduction in fees for this category is $4,867.50.

**C.    Time Attributable to Intraoffice Conferences Will be Adjusted by Project Category.**

The Audit Report identified time entries totaling $122,821.50 for intraoffice conferences by professionals and paraprofessionals within the applicant's firm. The United States Trustee identified an additional $12,478.50 in such entries. Paragraph 15 of the Fee Guidelines states that the applicant must explain time spent in intraoffice conferences.

The court recognizes that this is an unusual case commenced as an involuntary with the related case of California Plan. There were confirmed allegations of a widespread fraudulent scheme to deceive investors of millions in dollars. At the commencement of the case, the debtor and California Plan continued to conduct business. There was an urgent need to seize control of the debtor's assets and to investigate his business practices and the extent of his assets. Since the debtor's deception posed a risk that assets would be transferred or hidden, the applicant proceeded with haste, often assigning teams of professionals to tasks. This case also presented a number of unique challenges, such as the incarceration of the debtor, the exemption and support claims asserted by the debtor's estranged spouse, and the potential claims that may be asserted by and against the California Plan estate.

Under the circumstances, some intraoffice conferences and billing excesses were anticipated.

7

However, Howard Rice staffed this case with eleven directors billing at hourly rates ranging from $450 to $625, six associates billing at hourly rates ranging from $215 to $390, and eleven legal assistants and others billing at hourly rates ranging from $85 to $230. It frequently engaged multiple directors in the same project. This inappropriate level of staffing is reflected in the numerous intraoffice conferences in this application. Many of the tasks performed by the applicant consumed fees in excess of a reasonable amount. Rather than disallow fees based on individual entries for intraoffice conferences, the court intends to make adjustments as appropriate by project category.

### D. Compensation for Participation by Multiple Attorneys is Disallowed.

The Audit Report identified in Exhibit E $61,782.25 in fees associated with the participation by more than one professional from the applicant's firm in a conference, hearing, or other event. The United States Trustee identified an additional $9,826.25 in fees for services in which multiple professionals participated. The Creditors also assert that the applicant had multiple attorneys from San Francisco attending hearings in San Jose. The duplication of services that results from the participation of multiple professionals leads to excessive time that is not justified or compensable. Normally, it is appropriate for only one attorney from a firm to participate in a conference or a meeting or to attend a hearing. Paragraph 16 of the Fee Guidelines provides that absent an explanation for the necessity, the court will not allow compensation for the participation of multiple attorneys in the same event. The court will allow compensation only for the professional with the lowest billing rate.

The applicant responds that the Audit Report erroneously assumes that multiple parties participated in the same event on a given date rather than separate events. Unless the applicant is prepared to state by declaration that there was no overlap on a given date, the court will infer the participation by multiple professionals for the same event based on the descriptions of the tasks. Where the event was particularly significant or important to the case, and a professional brought a different expertise to bear, such as the meeting in Placer County concerning development of the Kings Beach property, the examination of the debtor, meetings about tax issues, and the meeting with the California Plan trustee, the court has allowed the participation by multiple professionals. Compensation for the following time entries will be disallowed on the basis that multiple attorneys participated in the same

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

conference, meeting, or hearing, resulting in a duplication of services.  However, none of the following time entries are attributable to the attendance by multiple attorneys at the same hearing, as asserted by the Creditors.  The Audit Report did not indentify any such entries.  The court will disallow only the amount of fees attributable to an actual overlap in time and services.  However, compensation for services of the timekeeper with the lowest billing rate will be allowed.

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 04/04/06 | Lafferty | Calls to U.S. Trustee, B. McGrane's office, re status. | 0.30 | 157.50 |
| 04/04/06 | Lafferty | Confer with K. Everett re visit to California Plan office, re related issues, analysis. | 0.70 | 367.50 |
| 04/04/06 | Schenkkan | Meet with Trustee and W. Lafferty to discuss background of case and first initiatives. | 1.20 | 750.00 |
| 04/10/06 | Lafferty | Confer with K. Everett re asset search issues. | 0.20 | 105.00 |
| 05/05/06 | Schenkkan | Confer with B. Haskett re interviews. | 0.40 | 250.00 |
| 05/11/06 | Lafferty | Prepare for meeting, meet with K. Everett re prioritizing asset investigations, related issues. | 0.30 | 157.50 |
| 05/11/06 | Lafferty | Confer with K. Everett re numerous open issues re disposition of Kings Beach Property, professionals, etc. | 0.30 | 157.50 |
| 05/11/06 | Schenkkan | Confer with K. Everett, W. Lafferty and G. Kaplan re status and next investigative steps. | 1.00 | 625.00 |
| 05/12/06 | Schenkkan | Conference call with B. Haskett re next investigative steps. | 0.80 | 500.00 |
| 05/19/06 | Lafferty | Review email from L. Kaufman, confer with client (.3); Calls to L. Kaufman re same (.6). | 0.90 | 472.50 |
| 05/22/06 | Schenkkan | Forward [Haskett email] and confer with K. Everett, W. Lafferty and B. Haskett re same. | 0.60 | 375.00 |
| 05/30/06 | Lafferty | Telephone conference with K. Everett, K. Sakamoto re [schedules]. | 0.20 | 105.00 |
| 06/05/06 | Schenkkan | Confer with B. Haskett issues. | 0.20 | 125.00 |
| 06/06/06 | Lafferty | Meet with client re schedules, review data, draft inserts, footnotes. | 2.00 | 1,050.00 |
| 06/12/06 | Lafferty | Confer with D. Schenkkan, client re investigation. | 0.80 | 420.00 |
| 06/12/06 | Schenkkan | Confer with Kyle, W. Lafferty re same. | 0.90 | 562.50 |

MEMO. DECISION & ORDER ON 1ST INTERIM FEE APPLICATION OF HOWARD RICE

| Date | Attorney | Description | Hours | Amount |
|---|---|---|---|---|
| 06/13/06 | Lafferty | Confer with client, review amount generated by properties, expenses, review proposals re cash collateral uses. | 1.70 | 892.50 |
| 06/13/06 | Lafferty | Confer with client re '341 meeting; prepare for same. | 1.20 | 630.00 |
| 06/20/06 | Lafferty | Confer with K. Everett re brokerage issues. | 0.20 | 105.00 |
| 06/27/06 | Kaplan | Conference with K. Everett, W. Lafferty, E. Fleishacker re analysis of note on debtor property without evidence of either payoff of assumption. | 0.20 | 95.00 |
| 06/27/06 | Lafferty | Telephone conference with K. Neale, client re [Indianapolis property]. | 0.30 | 157.50 |
| 06/29/06 | Lafferty | Confer with G.M. Kaplan, client re stipulations, re strategy re cash collateral. | 0.20 | 105.00 |
| 07/06/06 | Lafferty | Confer with K. Everett, G.M. Kaplan re budget, re cash collateral stipulations and strategy. | 0.30 | 157.50 |
| 07/18/06 | Lafferty | Confer with M. Dunsford re conflicts issues. | 0.20 | 105.00 |
| 07/25/06 | Lafferty | Confer with K. Everett, G.M. Kaplan re cash collateral stipulations, re strategy. | 0.30 | 157.50 |
| 07/27/06 | Lafferty | Confer with K. Sakamoto re records retention issues, confer with client re same. | 0.20 | 105.00 |
| 07/31/06 | Lafferty | Confer with client, G. M. Kaplan re strategy, re status. | 0.80 | 420.00 |
| 08/15/06 | Lafferty | Confer with G.M. Kaplan, client re issues pertinent to counteroffer on Santa Barbara property, form of purchase agreement. | 0.20 | 105.00 |
| 08/16/06 | Lafferty | Confer with Trustee, S. Danaye-Elmi, K. Sakamoto re status of Bercik, O'Neal brokers applications for employment. | 0.40 | 210.00 |
| 08/16/06 | Lafferty | Confer with G.M. Kaplan, client re status of cash collateral stipulations. | 0.10 | 52.50 |
| 08/16/06 | Danaye-Elmi | Meet with K. Everett, B. Lafferty and K. Sakamoto re pending applications to employ. | 0.40 | 100.00 |
| 09/22/06 | Lafferty | Calls to S. Goodsell re asset sale issues. | 0.10 | 52.50 |
| 09/28/06 | Lafferty | Confer with client, G.M. Kaplan re Santa Barbara, Safari Mobile Home Park sale motions. | 0.30 | 157.50 |
| 09/28/06 | Lafferty | Confer with K. Everett re amendments to pleading. | 0.20 | 105.00 |

MEMO. DECISION & ORDER ON 1ST INTERIM FEE APPLICATION OF HOWARD RICE

| | | TOTAL | 18.10 | $9,892.50 |
|---|---|---|---|---|

The time entries for the participation by multiple attorneys in the same event total $9,892.50, and compensation for this duplication of services is disallowed.

**E.      Travel Time is Reduced.**

Exhibit F-1 to the Audit Report identified time entries totaling $22,924.75 that are associated with non-working travel.  In its Response to the Audit Report, Howard Rice consents to a reduction of its fees by $6,962.25 to account for travel time.

**F.      Clerical Time is not Compensable.**

The Audit Report identified in Exhibits G-1 to G-6, G-8, and G-9 time entries totaling $39,649 that are attributable to clerical tasks.  Services that are purely clerical, ministerial, or administrative in nature are not compensable and should be disallowed.  Missouri v. Jenkins, 491 U.S. 274, 288 fn.10 (1989); Sousa v. Miguel, 32 F.3d 1370, 1374 (9th Cir. 1994).  Paragraph 18 of the Fee Guidelines provides that fees incurred performing administrative tasks is not compensable.  The applicant included in this application time incurred for monitoring and reviewing the docket, calendaring, organizing documents and files, ordering transcripts, locating, retrieving, and distributing documents, serving pleadings and preparing proofs of service, and e-filing and uploading pleadings.  These tasks are not in the nature of  professional services and must be absorbed by the applicant's firm as an overhead expense.  Fees in the amount of $39,649 are disallowed on the basis that they are clerical in nature.

**G.      Time Spent Revising Time Records is Not Compensable**.

The Audit Report identified in Exhibit G-7 $1,901.25 in time entries attributable to reviewing and revising time records.  Howard Rice acknowledges that time spent editing time records to bring them into compliance with the Fee Guidelines is not compensable and should not have been included in the application.  It identified an additional $237.50 in fees incurred to revise time records.  These

entries are identified in Exhibit 9 to Howard Rice's Response to the Audit Report. Where the time entries are incomplete or require editing in order to comply with the court's standards, the editing services are a clerical function that are not compensable. In re CF & I Fabricators of Utah, Inc., 131 B.R. 474, 485 (D. Utah 1991). The fees totaling $2,138.75 attributable to this task are disallowed.

**H.     Fees for Time Attributable to Legal Research Will be Adjusted by Project Category.**

The Audit Report identified in Exhibit K time entries totaling $82,097.50 in fees incurred performing legal research. The United States Trustee identified several legal research projects for which the fees totaling $6,848.75 appear excessive. In its Response to the Audit Report, Howard Rice identified $6,142.25 in time entries that do not appear to relate to legal research at all but to fact investigation. It also proposed that the court reduce its fees by fifty percent (50%) of the amount identified by the United States Trustee as excessive. The court finds the applicant's proposal acceptable and disallows $3,424.38 in fees. With respect to the remaining entries in Exhibit K to the Audit Report, rather than disallow fees based on individual time entries for legal research, the court intends to make adjustments as appropriate by project category.

**I.     Fees Attributable to Asset Investigation are Allowed.**

The applicant incurred $162,864 in fees associated with its investigation of the debtor's asset and liabilities. The time entries for these services are identified in category .0002 of the fee application. The Creditors contend that they provided a list of Schneider's real properties to the estate, and there was a mutual understanding that the trustee would merely verify the debtor's ownership interests. They further contend that rather than confirm the accuracy of the list the Creditors provided, the trustee's counsel expended excessive fees to conduct an unnecessary asset investigation. The Creditors also contend that the trustee's retention of a private investigator from Orange County to assist the trustee with the asset investigation was unnecessary. Moreover, they complain that the investigator's efforts did not result in any assets other than the ones that were already known.

The applicant disputes that there was a mutual understanding that the trustee would limit the scope of his asset investigation. Moreover, the trustee has a fiduciary duty to the estate and its creditors

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMO. DECISION & ORDER ON 1ST INTERIM FEE APPLICATION OF HOWARD RICE
Case: 06-50441     Doc# 757     Filed: 10/22/07     Entered: 10/22/07 16:36:18     Page 12 of 21

to collect all assets of the estate for the benefit of creditors. This case was commenced amid evidence of a wide-ranging fraud scheme conducted by the debtor. There was a significant risk that the debtor had surreptitiously transferred assets outside the reach of creditors. It is within the trustee's business judgment, and subject to court approval, whether to retain qualified professionals to assist the trustee in fulfilling the trustee's duties. Had the trustee or his professionals successfully discovered other assets, the Creditors would not have been disgruntled. The court is not prepared to determine that the fees incurred to investigate the debtor's assets and liabilities are excessive in view of the size of this estate. Had the trustee and his professionals not expended substantial effort to conduct an independent investigation to locate assets, the Creditors may have had cause to complain.

**J.      Time for Response to Application for Authority to Transfer Files is Excessive.**

The applicant incurred $6,900 in fees in connection with the trustee's response to an application by the California Plan trustee for authority to transfer the loan files for valid transactions actually secured by deeds of trust to another servicing agent, PLM Lenders, subject to a lender's ability to recover its own loan file. The matter was time sensitive so as not to disrupt the flow of payments to the lenders. The California Plan estate had neither the resources nor the ability to service the loans. Moreover, it would earn no fees and receive no other benefit from servicing the loans. The primary concern of the Schneider trustee was access to the files being transferred, which issue was resolved expeditiously by stipulation with the California Plan trustee. The amount of fees that Howard Rice incurred in connection with this task is excessive. The court will allow a reasonable amount, $3,500, of the fees requested and disallow the balance of $3,400.

**K.      Time for Response to Order to Show Cause is Excessive**

The debtor, having been incarcerated after the petition date, failed timely to file statements and schedules in the case pursuant to FED. R. BANKR. P. 1007. The court issued an Order to Show Cause on May 2, 2006. The applicant incurred $4,850 in fees to consult with the trustee concerning the OSC, to file a written response to it, and to appear at a hearing on the OSC. The applicant simply notified the court on behalf of the trustee that the trustee would undertake the investigation necessary to prepare and

13

file the required statements and schedules as accurately as he is able. The fees associated with these services are excessive, so the court disallows $2,850 of the amount requested.

**L.      Fees Related to Deborah Schneider are Allowed in Part.**

Because of Deborah Schneider's unique position, the applicant anticipated that she may be aware of the debtor's business activities, financial condition and assets. After the applicant conducted a Rule 2004 examination of Deborah Schneider, information came to its attention that suggested that her prior testimony was not completely truthful, so the applicant sought a further examination. Deborah Schneider responded with a motion for protective order because she was eight and one-half months pregnant with her fourth child and had been ordered to bedrest. The applicant, on behalf of the trustee, also filed a complaint to recover a post-petition transfer of cash and objected to Deborah Schneider's claims of exemption, raising and briefing the threshold issue of the timeliness of the claim. She also asserted a claim against the estate for support of their four minor children and herself. The applicant incurred $107,810 in fees associated with matter .0022, "Deborah Schneider/Divorce Matters." The Audit Report also identified in Exhibit L-4 $43,778.75 in fees associated with the Rule 2004 examination of the debtor's spouse and in Exhibit L-5 $6,027.50 in fees associated with the motion for a protective order. The trustee settled Deborah Schneider's claims for support and exemptions during a subsequent application period. It is premature to award all the fees requested at this juncture before the court has reviewed and considered the aggregate fees incurred by the applicant in connection with matters concerning Deborah Schneider. The fees set forth in matter .0022 of the application and Exhibits L-4 and L-5 of the Audit Report, less $4,722.50 to adjust for overlap between these categories, total $152,893.75. The court will allow one-half of that amount, $76,446.86, at this time and reserve ruling on the balance for later determination.

**M.      Time for Application to Employ Development Specialists, Inc. is Excessive**

The trustee sought to employ his own firm, Development Specialists, Inc., as a financial consultant to perform certain forensic accounting projects. Howard Rice prepared the employment application, which sought to retain DSI without being subject to the statutory cap on trustee

14

compensation under § 326. Several creditors objected to this compensation arrangement. The applicant consulted with its client and the office of the United States Trustee before ultimately modifying the terms of employment such that DSI would be compensated within the § 326 cap. For these services, Howard Rice billed the estate $7,155. Because the estate did not benefit from these services, the fees associated with them will be disallowed.

**N.      Time for Opposition to Motion by Allen Chase and Direct Marketing Solutions, Inc.'s Motion for Relief From the Automatic Stay is Excessive**

Secured creditors Allen Chase and Direct Marketing Solutions, Inc., which were secured by second deeds of trust on three properties of the debtor located in Santa Cruz, Atherton, and Hillsborough, California, filed a motion for relief from the automatic stay because the debtor had not made any post-petition payments on the properties. The court has posted on its website its guidelines for motions for relief from stay, which clearly indicate that the court's customary practice is to grant limited relief to allow a secured creditor to post a notice of default where there is a post-petition default in payments by the debtor. California law provides for a ninety day notice period after the posting of a notice of default before the secured creditor may proceed to sale by recording a notice of trustee's sale. The court's customary practice allows the debtor some breathing room to try to cure the default. It is also less prejudicial to the estate since the creditor must return to court to obtain further relief. Given the post-petition default and the declining market for residential properties at that time, there were no compelling circumstances in the case that would have warranted a different approach with respect to this motion. Notwithstanding the court's normal practice, which is widely available to the bankruptcy bar in this district, the applicant launched a vehement objection to the motion. Consistent with its usual practice, the court granted limited relief to the secured creditor to record its notice of default. For what should have been a simple, straight-forward objection to the motion, the applicant incurred $9,063.50 in fees to review, research, consider, respond to, and appear in opposition to the motion. This amount far exceeds what is reasonably necessary to vigilantly address the motion. For these reasons, the court will allow the applicant $2,000 in fees for responding to this motion and disallow the balance in the amount of $7,063.50.

Prepetition, the debtor acquired and commenced development of fifteen semi-contiguous parcels of real property in Kings Beach, California into a mixed-use project. He had retained consultants and professionals and had obtained some entitlements. These properties were the most valuable assets of the estate. As shown in Exhibit L-10 to the Audit Report, the applicant incurred $81,227.75 in fees during this application period to address issues relating to the properties, including the sale of the properties. In Exhibit 11a to Howard Rice's Response to the Audit Report, the applicant broke the time entries relating to the Kings Beach properties into more discrete subcategories, including "Analysis of Entitlements Status and Potential Development," "Lienholder and Co-owner Interests," "Employment of Professionals," "Regulatory Agency Sale and Development," "General Marketing and Sale Efforts (Including Valuation)," "Marketing and Sale – Real Estate Brokers," "Marketing and Sale – Agreements and Contracts," "Responding to Offers and Negotiations," and "Cash Collateral Matters." These subcategories more accurately represent the broad scope of services the applicant provided in connection with the property.

The applicant assisted the trustee in assessing the status of development and prospects for completion for sale by the estate. The trustee, with the applicant's assistance, employed the same professionals that the debtor had retained to evaluate the estate's alternatives with respect to the properties. The applicant reviewed the status of the title to the properties and the presence of any liens. It also discussed with the local redevelopment agency its interest in acquiring the properties for a government center and responded to its request for proposal.

With respect to the sale of the properties, the applicant worked with the trustee to evaluate the broker's assessment of the properties, monitored and worked with the broker on the strategy for marketing the properties, responded to offers for the properties, and prepared the documents for the sale of the properties. The Kings Beach properties were ultimately sold in January 2007 for $5 million. Because the sale of the Kings Beach properties had not closed during this application period, and the court will review the aggregate fees incurred in connection with this matter in a subsequent application period, it is premature to allow all the fees incurred to date in this category. The court will allow half of the $81,227.75 incurred to date and reserve ruling on the balance of $40,613.87 for later

16

determination.

**P.      Time Related to Santa Barbara Condominium is Allowed.**

The debtor owned a condominium in Santa Barbara, California that served as a vacation property.  Howard Rice incurred $40,748.50 in fees for services related to the Santa Barbara condominium.  The time entries are set forth in Exhibit L-11 to the Audit Report.  In Exhibit 12 to Howard Rice's Response to the Audit Report, the applicant broke the time entries relating to the Santa Barbara condominium into more discrete subcategories, including "Broker Employment," "Listing Agreement," "Turnover of Possession/Removal of Fixtures/Condition of Property," "Purchase Agreement and Sale Process," "Motion to Sell Draft, Revisions and Filing," and "Operations and Claims."  The applicant advised the trustee concerning offers for the condominium and the requirements for sale, prepared the application to employ the broker, reviewed the listing agreement and sale documents and revised them to apply to a sale by a bankruptcy trustee rather than the titled owner.  After the petition was filed, the debtor or his representative and the debtor's spouse removed some personal property and fixtures from the condominium, leaving parts of the property in a state of disrepair and the property as a whole allegedly unsalable.  The applicant assisted the trustee in investigating the removal and restoring the property for sale.  The Santa Barbara condominium was ultimately sold for $1.45 million in November 2006.  Because the sale of the Santa Barbara condominium had not closed during this application period, and the court will review the aggregate fees incurred in connection with this matter in a subsequent application period, it is premature to allow all the fees incurred to date in this category.  The court will allow half of the $40,748.50 incurred to date and reserve ruling on the balance of $20,374.25 for later determination.

**Q.      Time Related to Safari Mobile Home Park LLC is Allowed.**

Schneider was the sole member and manager of a limited liability company that owned a mobile home park in Avery, California.  As shown in Exhibit L-12 to the Audit Report, Howard Rice incurred $14,598.50 in fees for services related to Safari Mobile Home Park.  In Exhibit 13 to its Response to the Audit Report, the applicant further broke down the time entries into subcategories, including

utility service to the property, reviewed offers on the property, documented the sale, and prepared the sale motion. The mobile home park was sold for $1,125,000 in November 2007. Because the sale of the Safari Mobile Home Park had not closed during this application period, and the court will review the aggregate fees incurred in connection with this matter in a subsequent application period, it is premature to allow all the fees incurred to date in this category. The court will allow half of the $14,598.50 incurred to date and reserve ruling on the balance of $7,299.25 for later determination.

**R.     Remaining Objections to Fees Are Overruled.**

The Creditors assert that the case should be converted to one under chapter 7 so that the trustee's attorneys can no longer incur fees. Neither the Creditors or any other party has moved to convert this case to one under chapter 7. Were the case converted, the estate would still have to be administered. Assets would have to be evaluated, marketed, and sold. Potential claims against third parties must be examined. There is no reason to believe that this case would be less costly to administer under chapter 7 than it would be under chapter 11.

The Creditors also assert that the applicant has been performing the trustee's duties so that it can incur legal expenses in excess of the statutory cap on trustee compensation under § 326. Specifically, the Creditors assert that it was unnecessary for the trustee to have two attorneys, one of whom has a billing rate in excess of $600, accompany him to Kings Beach on more than one occasion. Having reviewed all of the applicant's time entries, it appears that the services the applicant has performed on behalf of the trustee during this application period are professional in nature and are compensable from the estate. The administration of this estate is sufficiently complex to warrant the employment by the trustee of professionals to assist him in performing his duties.

With respect to the Kings Beach properties, they are the most valuable assets of the estate. They also gave rise to important issues, such as whether to develop the properties or sell them to a governmental agency, that required the input of professionals. It was not unreasonable for the trustee to have the assistance of both his bankruptcy counsel and real estate counsel to attend two significant meetings concerning the Kings Beach properties.

18

These objections by the Creditors are overruled. All remaining objections to the application are also overruled.

**S.    Payment of Certain Expenses is Disallowed.**

**1.    Expenses That Appear Double-Billed Are Allowed**.

The Audit Report identified in Exhibit M $523.31 in expenses that appear to have been double-billed. Howard Rice has clarified in Exhibit 14 to its Response to the Audit Report that each of the expense entries identified by the fee auditor are in fact distinct. Payment of these expenses is allowed.

**2.    Phototcopy Expenses Are Reduced.**

The Audit Report identified in Exhibit O $271 in expenses that the firm appear to have billed for 271 photocopies at $1.00 each. The firm clarified that the expense was incurred to make color copies in connection with marketing the Kings Beach Properties, but it has agreed to reduce its request for expenses reimbursement by $230.35.

**3.    Overnight Delivery and Messenger Services Expenses Are Allowed.**

The Audit Report identified in Exhibit Q $10,343.72 in expenses for overnight delivery and messenger services. Howard Rice clarified in its Response to the Audit Report that each line item represents the monthly invoice amount from its vendors, not the expense for individual deliveries. It also itemized the delivery services by attaching copies of the vendors' invoices and the service requests. The supplemental documentation adequately supports the applicant's request, so expense reimbursement of $10,343.72 for overnight delivery and messenger services is allowed.

**4.    Facsimile Charges Are Allowed.**

The Audit Report identified in Exhibit R facsimile charges totaling $1,075. Paragraph 32 of the Fee Guidelines provides that an applicant may recover its actual cost for outgoing facsimile transmissions and may charge up to $0.20 per page for incoming facsimiles. Although it customarily charges its clients $1.00 per page for outgoing facsimiles, it has reduced that charge to $0.20 per page

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

for this case. It does not charge for incoming facsimiles. Although this practice is not in conformity with the Fee Guidelines, the applicant requests that the court approve its facsimile charges. Because the amount is de minimus, the court will allow the facsimile charges as billed.

### 5.    Travel Expense Reimbursement Are Allowed in Part.

The Audit Report identified in Exhibits U and V $1,653.17 and $186,94, respectively, in travel expenses for which the applicant requests reimbursement. The United States Trustee requests further explanation of the expense items that exceed $250. The Creditors also object to the request for reimbursement for hotel accommodations, asserting they are too luxurious, and for all other travel expenses.

In Exhibit 16 to Howard Rice's Response to the Audit Report, the applicant attached documentation supporting some of the requests for expense reimbursement. Paragraph 21 of the Fee Guidelines provides that documentation must be retained and made available upon request for all expenditures in excess of $50. Of the entries for travel expense reimbursement set forth in Exhibits U and V to the Audit Report, $268.63 in expenses that exceed $50 are not supported by documentation and are disallowed. The applicant also indicated that it has no objection to the disallowance of $260 incurred by Mr. Larsen for hotel accommodations in Sacramento as he was in route to Kings Beach. All other travel expenses, including hotel expenses, appear reasonable and are allowed.

### CONCLUSION

For the reasons stated, the first interim application of Howard Rice is granted as follows. The court disallows $93,377.98 in fees and $758.98 in expense reimbursement. The court reserves ruling as to an additional $144,734.24 in fees. Of the amounts requested in Howard Rice's first interim application, the court approves fees in the amount of $815,679.78 and expense reimbursement of $37,577.08.

IT IS SO ORDERED.

\* \* \* **END OF ORDER** \* \* \*

MEMO. DECISION & ORDER ON 1ST INTERIM FEE APPLICATION OF HOWARD RICE
Case: 06-50441    Doc# 757    Filed: 10/22/07    Entered: 10/22/07 16:36:18    Page 20 of 21

Case No. 06-50442-MM

## COURT SERVICE LIST

WILLIAM J LAFFERTY
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
3 EMBARCADERO CENTER 7TH FLOOR
SAN FRANCISCO CA 94111

SAEED FAZELI
PO BOX 9202
SAN JOSE CA 95157

CHARLES B GREENE
LAW OFFICES OF CHARLES B GREENE
84 WEST SANTA CLARA ST SUITE 770
SAN JOSE CA 95113

MEL NASHBAN
PO BOX 9202
SAN JOSE CA 95157

EDWINA E DOWELL
OFFICE OF THE US TRUSTEE
280 SOUTH FIRST ST ROOM 268
SAN JOSE CA 95113

ANTHONY POCH
PO BOX 9202
SAN JOSE CA 95157

MICHAEL A ISAACS
CHARLES P MAHER
LUCE FORWARD HAMILTON &
SCRIPPS LLP
RINCON CENTER II
121 SPEAR STREET SUITE 200
SAN FRANCISCO CA 94105-1582