Entered on Docket
September 29, 2008
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



**NOT INTENDED FOR PUBLICATION**

The following constitutes
the order of the court. Signed September 26, 2008

*Marilyn Morgan*
**Marilyn Morgan
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| In re: | Case No. 06-50441-MM |
|---|---|
| **MICHAEL J. SCHNEIDER,** | Chapter 11 |
| Debtor. | **MEMORANDUM DECISION AND ORDER ON SECOND INTERIM AND FINAL APPLICATIONS OF HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN, COUNSEL TO THE CHAPTER 11 TRUSTEE, FOR COMPENSATION AND EXPENSE REIMBURSEMENT** |

### INTRODUCTION

Howard Rice Nemerovski Canady Falk & Rabkin, counsel to the chapter 11 trustee, has requested approval of fees totaling $2,400,046 and expense reimbursement of $107,135.23 for its services rendered during the chapter 11 portion of this case. After reviewing the firm's second interim application for compensation and expense reimbursement, its final application, the objections thereto, the firm's responses to the objections, the audit report on the second interim application, and the responses thereto, the court awards total fees of $1,365,309.29 and expense reimbursement of $95,428.80, including those amounts previously awarded and paid.

# FACTUAL BACKGROUND

The debtor, Michael Schneider, was the principal and sole shareholder of California Plan, Inc., a mortgage brokerage company that solicited private investors to make secured real estate loans at above-market rates. Schneider, who was then an account executive for California Plan, purchased the business from its founder in 1993. California Plan earned revenues by charging interest rates above the return promised to investors and by servicing the loans. More recently, it modified its business model to earn revenues through loan origination fees, points, foreclosure fees, late fees and prepayment fees. However, its revenues were insufficient to fund operating expenses and make interest payments to investors. By the late 1990s, when borrowers repaid their loans in full, California Plan did not always forward the proceeds to the investors. It sometimes reconveyed deeds of trust to borrowers without informing investors. Instead, it continued to make monthly interest payments to the investors but retained or diverted the proceeds of the payoffs. This misappropriation was not susceptible to easy detection because California Plan serviced the loans through its own account, so lenders were unaware when borrowers ceased making payments.

California Plan also operated as a Ponzi scheme. It accepted funds from multiple investors but retained or advanced to a borrower only some of the funds. The balance was diverted to service existing loans. Schneider also represented to investors that their loans were secured by specific real estate when, in fact, many times a single property secured multiple loans. California Plan provided some investors with unrecorded deeds of trust that had been falsified to appear as if they had been recorded. As a consequence, not all investors were secured.

This fraudulent scheme was revealed when California Plan stopped making payments to some of its investors in early 2006. A group of those investors conducted an investigation and then filed involuntary chapter 7 petitions against both Schneider and California Plan on March 24, 2006. While the estate of California Plan had relatively limited assets, the Schneider estate included approximately twenty-five parcels of real property held either directly or through limited liability companies, an interest in a U.S. Virgin Islands airline, and notes payable by the airline in the face amount of approximately $2 million.

Schneider and California Plan consented to orders for relief under chapter 11, which were issued

2

**MEMO. DECISION & ORDER ON 2ND INTERIM FEE AND FINAL APPLICATIONS OF HOWARD RICE**
Case: 06-50441    Doc# 941    Filed: 09/26/08    Entered: 09/29/08 15:56:17    Page 2 of 17

on April 12, 2006. On motion by the petitioning creditors, I ordered the appointment of chapter 11 trustees in both cases. The United States Trustee selected Kyle Everett to serve as trustee in this case and Andrea Wirum to serve as trustee in the California Plan case.

Everett's firm, Development Specialists, Inc. ("DSI"), possesses forensic accounting skills, perhaps useful in tracing misappropriated funds, and diverse management, financial, and accounting skills. The trustee requested the appointment of Howard Rice as legal counsel to represent him in the case. He selected the firm on the basis of its depth of experience in a wide variety of practice areas, including bankruptcy, real estate and land use, and tax strategies and planning, as well as its reputation for responsiveness and performance in complex cases. I appointed the firm as counsel for the trustee by order issued April 26, 2006. The trustee also sought authority to employ his own firm, DSI, on an hourly basis as a consultant to assist in forensic accounting and developing an analysis of the debtor's assets and liabilities. However, when multiple creditors raised objections to the application to the extent that DSI would receive compensation in excess of the statutory limit imposed on trustees' fees, the trustee withdrew this request.

Schneider was indicted by local authorities and incarcerated shortly after the petitions were filed and the fraud scheme was revealed. He pled no contest to one hundred seventy-three felony counts and was sentenced to twenty-eight years in state prison.

The claims of defrauded investors constitute the vast majority of claims in the case. Many of California Plan's investors are elderly people with fixed incomes who had invested a substantial part or all of their retirement savings in California Plan. They have written letters or appeared at hearings to highlight the hardship imposed by the debtor's fraud.

The United States Trustee appointed a committee of unsecured creditors on August 22, 2006, but when the only trade creditor resigned, the committee was made up solely of defrauded investors. From early in the case, these investors expressed their concern that the administrative expenses of the estate, and professional fees in particular, would consume what remained of their life savings.

The trustee conducted an expansive investigation of the debtor's assets and liabilities. In addition to $22,062.50 that was paid to a private investigator, Howard Rice incurred $171,082 in fees over the course of the case to investigate the estate's assets and liabilities. Notwithstanding these

3

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

efforts, the trustee did not discover any additional assets.

Because there was insufficient cash to service the debt on the estates's real properties, the trustee promptly began liquidating the properties in October 2006. He first requested court approval of the sales of a condominium and a property owned by one of Schneider's limited liability companies. Individual defrauded investors objected, asserting that the sales prices were below market value. The committee asserted that the estate had no legitimate interest in assets acquired through fraud and that the properties were subject to a constructive trust for the benefit of the defrauded investors. It also feared that the sales would generate priority tax liabilities from capital gains. On behalf of the trustee, the firm responded with an omnibus reply, incurring fees of $46,200.50. I overruled the objections and approved the sales because a constructive trust may not be imposed without tracing the commingled funds, and the committee had failed to meet its burden of proof. Moreover, the trustee had articulated a sound business justification for the sales, shown that the properties had been adequately marketed, and established that the terms were fair and reasonable.

In November, the trustee presented another sale. The committee objected based on the same arguments, and the trustee replied, incorporating by reference his prior reply. This sale was also approved.

In December, the trustee noticed a real property sale, to which the committee objected based on the same substantive arguments. Although I had twice previously rejected the committee's arguments unequivocally, the firm prepared and filed a lengthy reply. At that time, I expressed serious concerns about the propriety of the committee's pursuit of the imposition of a constructive trust on estate assets and whether it was acting within the scope of its fiduciary duties. This sale was also approved.

Citing the same arguments, the committee again objected when the trustee sought approval of sales in January 2007. The trustee replied, substantially incorporating his prior points. At this hearing, I stated in no uncertain terms that the committee was in breach of its fiduciary duties by pursuing a constructive trust theory since it appeared that the remedy would benefit the defrauded investors solely to the derogation of the interests of other unsecured creditors of the estate. As before, the committee's objection was overruled and the sales approved.

Although the committee parroted substantially the same arguments over the course of six asset

4

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

sales, Howard Rice incurred an additional $72,360.75 in fees defending each of the subsequent sales after having already incurred $46,200.50 in fees in connection with the first sale. The trustee's arguments in reply to each of the committee's objections were substantially the same. At least four attorneys collaborated to prepare the replies.

The United States Trustee dissolved the committee on January 9, 2007. Notwithstanding its dissolution, the committee appealed the January sales order. The trustee opposed the committee's ex parte motion for a stay pending appeal, and I promptly denied the motion. Although the committee did not file a motion in the district court for a stay pending appeal, the firm expended resources to prepare a draft objection to that non-existent request. Following its dissolution, the committee did not prosecute the appeal in the district court. Nevertheless, Howard Rice incurred $60,244 in fees defending the appeal through dismissal on July 11, 2007.

Through the first half of 2007, the trustee continued to liquidate properties. He sought and obtained court approval of the sales of several other real properties. The asset sales generated net sales proceeds of approximately $4.2 million for the estate. Many of the properties sold by the trustee were residential properties, which rarely require input from counsel. Notwithstanding, the firm incurred a substantial amount in fees in connection with the real property sales. While the firm showed $454,138 in the "Asset Sales" project category and another $55,576.50 in the "Kings Beach" project category, the firm actually had billed $588,342.50 to the sales achieved by the trustee, which fees are reflected in the table below.

| Property Description | Date Sale Approved | Sales Price | Net Sales Proceeds | Attorneys' Fees Incurred |
|---|---|---|---|---|
| 1300 Plaza de Sonadores Santa Barbara, CA | November 2, 2006 | $1,450,000 | unknown | $45,298.50 |
| Safari Mobile Home Park 4482 Moran Rd. Avery, CA | November 7, 2006 | $1,125,000 | unknown | $22,278.50 |
| Commodore Hotel 825 Sutter St. San Francisco, CA | November 8, 2006 | $15,726,000 | $468,998 | $18,070.50 |

5

**MEMO. DECISION & ORDER ON 2ND INTERIM FEE AND FINAL APPLICATIONS OF HOWARD RICE**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

| | | | | |
|---|---|---|---|---|
| 15 parcels on N. Lake Blvd., Salmon Ave., and Trout Ave. Kings Beach, CA | January 5, 2007 | $5,000,000 | $1,100,000 | $231,788.25 |
| 46 Alameda de las Pulgas Atherton, CA | January 16, 2007 | $2,405,000 | unknown | $51,500.00 |
| 644 Glen Canyon Ct. Santa Cruz, CA | January 16, 2007 | $1,050,000 | unknown | included in total above |
| 10140 Springmill Rd. Carmel, Indiana | February 23, 2007 | $405,000 | $163,000 | $23,458.50 |
| 3801 Watt Ave. Sacramento, CA | February 23, 2007 | $256,000 | $66,000 | $19,210.75 |
| Agate Bay Property 4793 N. Lake Blvd. Tahoe Vista, CA | May 17, 2007 | $702,500 | $76,000 | $155,369.50 |
| 433 El Centro Rd. Hillsborough, CA | August 17, 2007 | $2,804,000 | $349,000 | $21,368.00 |
| **TOTAL** | | | | **$588,342.50** |

Before the bankruptcy, Schneider lived an affluent lifestyle. He and his non-debtor spouse, Deborah Schneider, have four children, the youngest of whom was born while this case was pending. Shortly before the involuntary petitions were filed in March 2006, Mrs. Schneider petitioned for legal separation from the debtor. During the case, she received unauthorized post-petition transfers, which the trustee sought to recover. She also filed claims in the amount of $2,875,000 for future domestic support obligations and for certain exemptions, including a homestead exemption of $150,000, a vehicle, household goods, clothing, personal effects, and a retirement account containing $75,000. Upon the trustee's application, Presser & Robin LLP was appointed as special counsel to handle family law matters on behalf of the estate.

Howard Rice adopted a litigious posture with Mrs. Schneider. First, around the time that Michael Schneider was first incarcerated and during the last trimester preceding the birth of Mrs. Schneider's fourth child, she inadvertently missed by six weeks the deadline for filing a claim of exemptions. The trustee objected to and asked the court to summarily disallow all her claimed

exemptions, including clothing and personal effects. Here, the firm filed an extensive brief on a not very controversial issue, laden with personal attacks and supplemented with evidentiary objections, escalating the litigation. I allowed the late-filed exemptions as a matter of law.

Second, after Mrs. Schneider's initial Rule 2004 examination, the trustee sought a supplemental examination to determine the disposition of a washer and dryer and other household goods removed from a condominium in Santa Barbara. Although Mrs. Schneider was in her ninth month of pregnancy and ordered by her physician to bedrest, the firm insisted on an immediate deposition and sent two senior level attorneys to oppose Mrs. Schneider's motion to quash. Predictably, I ordered that the supplemental examination take place two weeks after the birth.

Third, in March 2007, the firm presented the trustee's proposed compromise with Mrs. Schneider of her claims of exemptions and for child and spousal support. The estate agreed to pay Mrs. Schneider $675,000 to avoid the claim for future support since Michael Schneider would be incarcerated for an indefinite period. No portion of the settlement amount was allocated to her exemptions. Although the bulk of Mrs. Schneider's claim was based on future support, surprisingly, neither the motion nor the notice of the hearing to approve the compromise mentioned § 502(b)(5), which disallows claims for non-dischargeable domestic support obligations that are unmatured as of the petition date. While the firm asserted that it considered this Code provision, it could not have given it due weight and still have concluded that the compromise was in the best interest of the estate. Because the compromise represented a substantial recovery on a claim on which Mrs. Schneider was unlikely to prevail, I denied approval of the compromise as not fair and equitable. Four months later, the trustee proposed a new compromise in the amount of $296,000, this time based primarily on Mrs. Schneider's state law exemptions and not primarily on the claims for spousal and child support. I approved the modified compromise.

Finally, in connection with the sale of the Schneiders' residence in Hillsborough in August 2007, the trustee filed a turnover motion to compel Mrs. Schneider to vacate the property because she had insufficient resources to relocate. She responded that she was in her predicament because the trustee had not paid to her even the undisputed portion of her exemption claim. The trustee replied with an exhaustive brief addressing the substantive merits of her underlying claims. Since Mrs. Schneider

7

indicated that she intended to timely vacate the property, the trustee's turnover motion was taken off calendar as unnecessary. All told, Howard Rice incurred $410,830.50 in fees to litigate against Mrs. Schneider and another $50,317 to conduct discovery against Mrs. Schneider. These fees are in addition to the $38,705 in fees sought by and paid to the estate's special family law counsel.

One aspect of the claims resolution process that was efficiently concluded related to the corporate entity's claims. The California Plan trustee asserted that Schneider diverted the assets of California Plan to his personal use, giving rise to a claim for, *inter alia*, the imposition of a constructive trust. The trustee and the California Plan trustee settled the claims between the estates, allocating 55% of the net proceeds of this estate to California Plan while retaining 45% of the proceeds of liquidation net of administrative expenses and priority claims. The compromise would eliminate a portion of the expenses for dual administration of the two estates.

Upon the motion of the United States Trustee, the court converted this case to one under chapter 7 effective December 31, 2007. The United States Trustee selected Andrea Wirum, the trustee in the California Plan case, to serve as the chapter 7 trustee in this case. The claims of two significant parties, the California Plan estate and Mrs. Schneider, have been settled. Very limited assets remain to be liquidated. The chapter 7 trustee is currently conducting a review of the claims filed in the cases.

In its several applications, Howard Rice requested fees totaling $2,400,046 and expense reimbursement of $107,135.23. The California Plan trustee, the United States Trustee, and the committee objected to the firm's first interim application for compensation. Former committee members and defrauded investors Bill Aspromonte, Saeed Fazeli, Mel Nashban, Anthony Poch, and Ann Poch have objected to the remaining applications, as have the United States Trustee and the California Plan trustee. The first and the second interim applications were referred for review and analysis by a fee auditor, Stuart, Maue, Mitchell & James. In all, Howard Rice incurred $357,782 in fees to prepare its own employment application, supplemental disclosures, and fee applications, to respond to objections and the fee auditor's reports, and to prepare the employment and fee applications of the trustee and his other professionals. The time records of the firm show only the hours spent but not a dollar value for each time entry, rendering it difficult to adjust the fees by the time entries.

**LEGAL DISCUSSION**

Section 330(a) of the Bankruptcy Code authorizes an award of reasonable compensation for actual, necessary services rendered and reimbursement of actual, necessary expenses to a professional employed under §§ 327 or 1103. 11 U.S.C. § 330(a)(1). Compensation is expressly prohibited for services that were not reasonably likely to benefit the estate or were not necessary to its administration. Id. at § 330(a)(4)(A). In determining what compensation is reasonable, the considerations are the nature, extent, and value of the professional's services, taking into account all relevant factors, including whether the services were necessary to the administration of the case, whether they were beneficial toward the completion of the case at the time rendered, and whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. 11 U.S.C. § 330(a)(3). Another critical factor is the extent of success in the case. Hensley v. Eckerhart, 461 U.S. 424, 436 (1983).

Counsel should exercise billing judgment to include in his or her request only those fees that are reasonable. Id. at 437. Howard Rice is well aware that a firm must strategically consider the reasonably anticipated recovery to the estate. Unsecured Creditors' Committee v. Puget Sound Plywood, Inc., 924 F.2d 955, 961 (9th Cir. 1991). This requires a consideration of whether the probable cost of legal services is disproportionately large in relation to the size of the estate and the maximum possible recovery. Id. at 959. In fact, counsel has a duty to analyze and make a careful judgment which claims to pursue and the degree of vigilance to devote, with the key objective being to maximize the net value of the estate. See In re Taxman, 49 F.3d 310, 315 (7th Cir. 1995). When the fees are disproportionate to the potential benefit generated by the services, counsel must balance his or her efforts accordingly. See id. at 314-16. Howard Rice bears the burden of establishing its entitlement to an award and demonstrating that its fees are reasonable. Hensley v. Eckerhart, 461 U.S. at 437.

This case does not involve a dispute concerning the quality of Howard Rice's services. The issue is whether the amount of fees incurred is reasonable in view of the services that were necessary to the case. As a guardian of the estate's funds, a court must review the applications to ensure that the requested fees conform to the parameters set forth above. In re Park-Helena Corp., 63 F.3d 877, 880 (9th Cir. 1995), cert. denied, 516 U.S. 1049 (1996); Taxman, 49 F.3d at 314-16; In re Riverside-Linden

Inv. Co., 925 F.2d 320, 324 (9th Cir. 1991); In re Mednet, 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000); In re Auto Parts Club, Inc., 211 B.R. 29, 33 (B.A.P. 9th Cir. 1997); § 330(a)(2). In making this determination, courts must adequately explain the reasons behind substantial reductions in fees. Moreno v. City of Sacramento, 534 F.3d 1106, 1116 (9th Cir. 2008).

In this case, Howard Rice failed to observe the principle that its services and fees must be scaled to the size of the estate and the maximum probable recovery. Regrettably, I conclude that Howard Rice's fees in this case are not reasonable and, therefore, I must determine what would be reasonable compensation for the services rendered.

Although Howard Rice has portrayed this case as a complex reorganization, in reality, it is primarily a real estate liquidation case that includes claims against an individual debtor by his estranged wife, defrauded creditors, and the debtor's corporation. The liquidation of properties has generated net proceeds of approximately $4.2 million. Nonetheless, during the course of its representation, the firm staffed the case with twenty-five attorneys who charged hourly billing rates ranging from $215 to $695. In addition, twenty-two paralegals and other staff with hourly billing rates ranging from $90 to $250 were assigned to perform tasks in the case. Administrative claims against the estate, including Howard Rice's fees, have totaled approximately $3.5 million. Other claims in the case total approximately $57 million. Obviously, the defrauded investors and other creditors will receive only minimal distributions on their claims.

I cautioned Howard Rice early in its representation and as the case progressed to maintain control over the accrual of attorneys' fees. On at least four occasions between summer 2006 and the end of that year, I warned that I would be scrutinizing professional fees closely. The transcript of a hearing held on October 13, 2006 on the exemptions claimed by the debtor's spouse reveals this statement to counsel:

> I've had numerous discussions with [lead counsel] on the record about my concerns over runaway professional fees in this case. I had hoped he would pass them on to you and to the other members of the firm who are involved in this case. There has been a great deal of creditor interest, and I expect that I will be reviewing fees very closely to insure that the resources available in the estate are devoted in a measure commensurate with the importance of the issues.

These concerns were repeated on November 9, 2006 in a chapter 11 status conference:

> I'm going to urge you all to pick and choose your issues very carefully . . . . I am so concerned about trying to keep . . . fees in check in this case, so that's just one of my overriding concerns, and I just mention that to you probably at every occasion that I have the opportunity to.

Similarly, numerous creditors frequently voiced their fears about the unchecked accrual of administrative expenses during the course of this case through letters, at hearings, and in objections to motions. In fact, lead counsel from Howard Rice acknowledged these concerns on July 7, 2006, repeating the adage that, "You can't let the perfect be the enemy of the good." Notwithstanding these admonitions, the accrual of professional fees was rampant.

**A.  Howard Rice Incurred Excessive Fees on Matters Involving Spouse Deborah Schneider.**

Overall, Howard Rice adopted a misguided strategy in matters involving Mrs. Schneider that resulted in unnecessary litigation and legal fees. It needlessly expended estate resources in an attempt to summarily disallow all of Mrs. Schneider's claimed exemptions when she inadvertently missed a deadline around the time her husband was incarcerated during her last trimester of a pregnancy. The firm should have known that this strategy was not cost effective for the estate because binding case law establishes a flexible standard for determining excusable neglect, and there is a strong policy to interpret exemptions liberally in favor of the debtor. Predictably, the estate did not prevail on its timeliness objection to Mrs. Schneider's claimed exemptions.

In another antagonistic move, the firm pushed for a second Rule 2004 examination of Mrs. Schneider at a time when common sense dictated that Mrs. Schneider's fragile medical condition precluded the examination. The firm's vehement opposition to Mrs. Schneider's motion to quash provided no benefit to the estate because, as warranted by the circumstances, I directed that the deposition take place after Mrs. Schneider gave birth to her fourth child.

Later, Howard Rice proposed an overly generous settlement of Mrs. Schneider's claim for unmatured future support even though there was little likelihood that her claim was allowable under § 502(b)(5). In the same compromise, the firm allocated no portion of the settlement amount to her claims for a $75,000 homestead exemption or a $75,000 retirement account, which were not reasonably susceptible to challenge. When I declined to approve that proposed settlement, the firm continued its aggressive litigation against Mrs. Schneider. It later presented a modified compromise at less than one-

11

half of the original settlement amount. Further, the firm commenced proceedings against Mrs. Schneider to evict her from her residence under circumstances in which it stood little to no chance of prevailing.

The firm billed the estate $410,830.50 in fees for litigation against Mrs. Schneider. When combined with the $50,317.50 in fees to depose Mrs. Schneider and the $38,705 previously paid to special family law counsel, it appears the estate incurred fees approaching $500,000 to litigate against Mrs. Schneider. This amount is grossly disproportionate to the benefit derived from the services. Many of the services in this category were neither necessary nor cost effective. Although Mrs. Schneider asserted a claim for future support in the amount of $2,875,000, there was never any likelihood that she would prevail on that claim. After reducing the requested fees based on all of these factors, a reasonable fee for the litigation against Mrs. Schneider could not possibly exceed $225,000. A substantial reduction in fees is warranted, and $274,853 in fees is disallowed in this category.

**B.    Howard Rice Incurred Excessive Fees on the Real Property Sales.**

Over the course of its representation, Howard Rice obtained on behalf of the trustee approval of the sale of twenty-four real properties. The firm billed over 1,000 hours at hourly rates of up to $695, incurring $588,342.50 in fees to prepare the real property sales to present to the court. However, it did not segregate its time records by real property sales. Instead, it consolidated all the real property sales in one project category, "Asset Sales," which totaled $454,138 in its applications. It also billed $55,576.50 to the sales of the Kings Beach properties. Howard Rice noted in its response to the fee auditor's report on the second interim application that the fee auditor mistakenly attributed certain time entries to the wrong asset sales. However, that error has no bearing for purposes of this analysis.

The sales generated net proceeds of $4.2 million for the estate. Nevertheless, the majority of the sales presented for court approval were routine sales of residential real properties, which should not have necessitated substantial input from counsel. The cost of the legal services in this area is disproportionate in relation to both the size of the estate and the net proceeds potentially realized by the estate. A reasonable amount for conducting the real property sales should not have exceeded $325,000.

The firm billed an additional $118,561.25 in fees to respond to the committee's repeated objections to several of the sales. The sales that drew objections all took place within a three to four

12

month period, and each time, the committee raised the same arguments. The bulk of the fees to defend the sales were incurred after the court had already rejected the committee's arguments unequivocally. Because the law did not change during the brief period at issue, the firm should have known that after its first response, any further responses could simply reiterate the first response. Instead, the firm expended great effort on each of several responses, which largely repeated the same arguments. A reasonable fee for responding to the committee's objections should have included only those fees incurred to respond to the first objection, plus an hour or two to prepare each subsequent response. As a result, the fees for responding to objections should not have exceeded $50,000. For these reasons, fees in the amount of $331,903.75 are disallowed in the category of asset sales.

### C. Howard Rice Incurred Excessive Fees on Asset Investigation.

The firm expended 453.60 hours, incurring $171,082.50 in fees, to conduct an expansive investigation of the debtor's assets and liabilities, including searching public records databases. It also reviewed the debtor's bank statements, credit card statements, telephone records, tax returns, and business records, obtained turnover of Schneider's bank accounts, and maintained a spreadsheet of the assets discovered. I previously authorized the payment of a substantial portion of these fees on an interim basis. However, viewed in context, it appears that the time expended and the fees incurred are excessive based on a number of factors. First, the firm's efforts did not discover any additional significant assets. Additionally, this type of investigative work is typically performed by the trustee, not its legal advisor, and would be compensated within the trustee's statutory fee. Indeed, the trustee was selected specifically because of his firm's forensic accounting expertise. Finally, the trustee also retained an independent private investigator who charged $22,062.50 for its investigative work. The firm's request for $171,082.50 in fees over and above the amount already paid to a private investigator is excessive because much of the work appears to have been unnecessary and produced no true benefit to the estate. While I understand the firm's need to review and assimilate the information uncovered by others, a reasonable fee for this more modest task certainly should not have exceeded $90,000, based on approximately half of the hours actually incurred. Fees in the amount of $81,082.50 are disallowed in this category.

13

**D. Howard Rice Incurred Excessive Fees on Compensation and Employment Matters.**

In addition to the preparation of its own employment application, Howard Rice prepared the employment applications of ten other professionals retained by the trustee. It also prepared its own fee applications seeking $2,400,046, as well as fifteen fee applications for the trustee and his other professionals, for which the compensation sought totaled $730,745.40. In addition, it responded to the objections to its fee applications and to the reports by the fee auditor. While a professional is entitled to reasonable compensation for time spent preparing fee applications, In re Nucorp Energy, Inc., 764 F.2d 655, 662 (9th Cir. 1985), it is not automatically entitled to all its fees incurred in unsuccessfully defending its fee application. In re Riverside-Linden Inv. Co., 945 F.2d 320, 323 (9th Cir. 1991). Further, this district has established Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees that provide:

> Fees for preparation of a fee application **may not exceed five percent** of the total amount of fees and costs requested in the application. This five percent guideline is a ceiling rather than a floor; preparation expenses equaling five percent are not presumptively reasonable. [emphasis in original]

There does not appear to be any good reason not to observe the guideline in this case. While five percent of the total fees requested on behalf of all professionals is $156,539.57, here Howard Rice seeks $357,782 in legal fees, representing 1,000 hours expended, in connection with the employment and compensation of professionals in this case. More than $115,000 in fees is attributable to the firm's responses to the fee audits. Under the circumstances, it is evident that the fees requested in this category are excessive in view of both the benefit to the estate and the total amount of fees sought and awarded to the trustee's professionals. I will allow Howard Rice fees in the amount of $225,000 for the time devoted to compensation and employment matters and disallow fees in the amount of $132,782 in this category.

**E. Howard Rice Incurred Excessive Fees to Defend the Appeal of the Kings Beach Sale Order.**

Although committee counsel attended the hearing on dismissal, the committee did not otherwise prosecute the appeal of the Kings Beach sale order following its dissolution. Nevertheless, Howard Rice incurred $60,244 in fees to defend the committee's appeal. Once the committee was dissolved, however, the firm should have moderated its services so that the work was more perfunctory. Moreover,

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

1 it undertook unnecessary services by preparing an opposition to a non-existent motion for stay pending
2 appeal in the district court. After disallowing time entries associated with this unnecessary time,
3 reasonable compensation for defending the appeal should not have exceeded $25,000. Fees in the
4 amount of $35,244 are disallowed in this category.

**F.     Compensation for Clerical Time is Disallowed.**

Services that are purely clerical, ministerial, or administrative in nature are not compensable from the estate. Missouri v. Jenkins, 491 U.S. 274, 288 fn.10 (1989); Sousa v. Miguel, 32 F.3d 1370, 1374 (9th Cir. 1994). Howard Rice has billed for services that include: monitoring and reviewing the docket; organizing and coding documents for filing; locating, retrieving, gathering, assembling and distributing documents; electronically distributing documents; ordering transcripts; preparing services packages, serving pleadings, updating service lists, and preparing proofs of service; editing time entries; e-filing and uploading pleadings; and coordinating the foregoing activities. Tasks of this nature are not professional services, and their costs must be absorbed by the firm as an overhead expense.

I previously disallowed $41,787.75 in fees for such clerical services included in the firm's first interim application. The time entries for these services are set forth in Exhibits G-1 through G-9 of the audit report on the firm's first interim application.

The audit report on the firm's second interim application has identified at Exhibits H-1 through H-8 time entries totaling $44,713.25 that are attributable to clerical services. My review of the time records in the firm's third and final application reveals that this problem has remained consistent. Disallowance of the time entries attributable to clerical services in the firm's final application warrants a reduction of $25,000. Consequently, I will disallow an additional $69,713.25 in fees for clerical services.

**G.     Estimated Expenses Are Disallowed.**

In its final application, Howard Rice requested estimated fees and expenses of $26,774.50 and $6,250, respectively. It set forth in supplements to the final application that it subsequently incurred actual fees of $42,908 and expenses of $2,451.85 after the application was filed. Although the fees actually incurred after the application was filed exceeds the estimated amount, I will allow those fees. Because the excess is less than the amount of the reductions in this application, the notice of the request

15

Case: 06-50441   Doc# 941   Filed: 09/26/08   Entered: 09/29/08 15:56:17   Page 15 of 17

1 for those fees is deemed adequate. However, estimated expenses in the amount of $3,798.15 that were
2 not actually incurred and are not supported by explanation are disallowed.

## **CONCLUSION**

I previously disallowed fees of $93,377.98 and costs of $758.98 in connection with the first interim application. In response to the audit reports and the objections to its applications, Howard Rice voluntarily reduced its fees by $31,913.73, including $1,995 for fees attributable to supervising document review, and it reduced its expenses by $7,149.30. For the reasons discussed above, additional fees totaling $925,587.50 and expenses of $3,798.15 are disallowed.

Compensation in the total amount of $1,365,309.29 in fees and $95,428.80 in expense reimbursement is hereby approved on a final basis, including those amounts that were previously awarded and paid. All remaining objections are overruled. As the Seventh Circuit observed in Taxman, this result may seem harsh, "[b]ut being a creditor and seeing your claim get eaten by a lawyer is a harsh fate as well." Taxman, 49 F.3d at 316.

IT IS SO ORDERED.

\* \* \* **END OF ORDER** \* \* \*

Case No. 06-50441-MM

## COURT SERVICE LIST

| | |
|---|---|
| WILLIAM J LAFFERTY<br>HOWARD RICE NEMEROVSKI CANADY<br>FALK & RABKIN<br>3 EMBARCADERO CENTER 7TH FLOOR<br>SAN FRANCISCO CA 94111 | MICHAEL A ISAACS<br>CHARLES P MAHER<br>LUCE FORWARD HAMILTON &SCRIPPS<br>RINCON CENTER II<br>121 SPEAR STREET SUITE 200<br>SAN FRANCISCO CA 94105-1582 |
| EDWINA E DOWELL<br>JOHN WESOLOWSKI<br>OFFICE OF THE US TRUSTEE<br>280 SOUTH FIRST ST ROOM 268<br>SAN JOSE CA 95113 | CHARLES B GREENE<br>LAW OFFICES OF CHARLES B GREENE<br>84 WEST SANTA CLARA ST SUITE 770<br>SAN JOSE CA 95113 |
| BILL J ASPROMONTE<br>690 OSCEOLA AVE #307<br>WINTER PARK FLA 32789 | SAEED FAZELI<br>PO BOX 9202<br>SAN JOSE CA 95157 |
| MEL NASHBAN<br>525 MCLEAN LANE<br>SANTA BARBARA CA 93108 | ANTHONY POCH<br>ANN POCH<br>3235 JENKINS AVE<br>SAN JOSE CA 95118 |
| JOHN LUCENA<br>PO BOX 10207<br>SAN JOSE CA 95157 | |